UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES PINE

                                        Plaintiff,

                    v.                                  **COMPLAINT**

                                                        23-cv-7148
JOHN HAMMER, LESTER SILVER, and HOWARD
SILVERBERG                                              **Related: 19-cv-8173(LAP)**

                                        Defendants.


        This is a civil rights suit by Plaintiff, James Pine, a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") who required effective medication to treat his chronic health conditions. As the following complaint makes clear, starting as early as 2015, DOCCS implemented a series of unwritten policies directed at discontinuing patients from medications that DOCCS' medical administrators felt had abuse potential irrespective of a patient's individualized needs. Medical providers would tell patients, "we don't give that medication here," "that medication is not used in DOCCS," or they would find other justifications for discontinuing MWAP medications – even if the patients had been effectively treated for years.

        In 2017, the informal practices of discontinuing medications were distilled into the Medications With Abuse Potential ("MWAP") Policy, authored by David S. Dinello and approved and implemented by his colleagues, DOCCS' medical administrators Carl Koenigsmann, John Morley, Susan Mueller, John Hammer and Paula Bozer. A benign reading of the MWAP Policy suggested a stated goal of reducing the prescription of MWAPs in the correctional setting. MWAPs include medications such as opioids, neuromodulating

medications such as Neurontin and Lyrica and medications such as Baclofen and Flexeril administered to treat severe muscles spasms. For a medical provider within DOCCS to prescribe any of these MWAPs, the Policy demanded the approval of a Regional Medical Director ("RMD") or the Chief Medical Officer ("CMO") before the prescription could be filled. The MWAP Policy stripped medical treatment decisions from the medical providers and specialists who treated patients and put it in the hands of remote medical administrators, who invariably denied the requests for MWAP medications, no matter the patient's individual medical needs. The denial of these medications especially affected an already vulnerable population: one that included patients with severe spinal and neurological issues, phantom pain from amputations, multiple sclerosis, and serious, chronic pain.

       Worse, the written policy and its restrictions created and enforced practices beyond the MWAP policy – including the discontinuation of medications when patients transferred between facilities, discontinuations based on non-medical reasons like accusations by corrections officers of diversion, and the rejection of recommendations of outside specialists for treatment of patients with MWAP medications despite medical necessity.  Instead of effectively treating patients, providers and mid-level clinicians would repeatedly prescribe ineffective alternatives, including medications with unbearable side effects.  Under MWAP and the related policies, customs, and practices thousands of DOCCS' patients suffered, including Plaintiff.

## JURISDICTION AND VENUE

1.      This action arises under 42 U.S.C. § 1983, *et seq*.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3)-(4).

3.      The acts complained of occurred in the Southern District of New York and other jurisdictions throughout New York State, including the Northern District of New York. Venue is

proper under 28 U.S.C. § 1391(b).

## JURY DEMAND

4.      Plaintiff demands trial by jury in this action.

## THE PARTIES

### Plaintiff

5.      Plaintiff, James Pine, suffers from documented chronic right leg and hip pain and right shoulder pain owing to osteolysis in the superior acetabulum and protrusion and polyneuropathy. Defendant discontinued his medication in 2017 until 2021 and again in 2022 until 2023.

### Defendants and State Actors

6.      **DOCCS** is responsible for the confinement and rehabilitation of approximately 35,000 individuals in its custody at approximately 44 state facilities.

7.      DOCCS is responsible for the medical care of all inmates in its custody.

8.      DOCCS receives state and federal financial assistance.

9.      Neither the New York Health Department of Health nor any other entity provides oversight to DOCCS' medical treatment, other than relating to infectious diseases like tuberculosis or hepatitis C.

10.     DOCCS' medical administration effectively creates its own rules.

11.     **Carl Koenigsmann, MD** ("Koenigsmann") served as the Chief Medical Officer ("CMO") for DOCCS until late 2018.

12.     **John Morley, MD** ("Morley") served as the CMO for DOCCS until mid-2020.

13.     **Carol Moores, MD** ("Dr. Moores") currently serves as the CMO for DOCCS. She started in that role in July of 2022.

14.      **Susan Mueller, MD** ("Mueller") is a Regional Medical Director ("RMD") and a treating physician at DOCCS.

15.      **Paula Bozer, MD** ("Bozer") is an RMD and a treating physician at DOCCS. Bozer served on the Policy Review committee for DOCCS which oversees the development and necessary changes to medical policies.

16.      **Defendant John Hammer, MD** ("Hammer") is an RMD and treating physician at DOCCS.

17.      **David S. Dinello, MD** ("Dinello") was an RMD and treating physician at DOCCS. Dinello was Chairman of the Pharmacy and Therapeutic Committee for DOCCS.

18.      **Lester Silver, MD** ("Dr. Silver") is a physician who works for DOCCS.

19.     **Susan Devlin-Varin, NP** ("NP Devlin-Varin") is a nurse practitioner who works for DOCCS.

20.      **Howard Silverberg, MD** ("Dr. Silverberg") is a physican who works for DOCCS.

21.      **Facility Treating Physicians and Mid-Level Clinicians ("MDs and Mid-Level Clinicians")** are responsible for the medical treatment of prisoners within the facility where they work. Facility doctors, physician assistants and nurse practitioners answer to the FHSDs, RMDs and CMO.

22.      **Consultants and Specialty Medical Providers** ("Consultants" or "Specialists") are medical professionals who practice either in DOCCS' Regional Medical Unit specialty clinics or outside of DOCCS at area hospitals, emergency rooms and specialty offices. Patients are sent to them for specialty assessment and treatment because DOCCS doctors and specialists do not possess the requisite expertise to treat the referred patient.

**FACTUAL HISTORY – HOW DOCCS ADMINISTERED HEALTH CARE**

<u>**The Role of the Chief Medical Officer ("CMO")**</u>

23.     The CMO is the ultimate arbiter of medical policy for DOCCS.

24.     CMO Koenigsmann was the ultimate arbiter of medical policy for DOCCS through late 2018.

25.     Though the CMO normally does not treat individual patients, the CMO is directly involved with DOCCS' Office of Counsel and the Attorney General's office when a patient sues DOCCS, often coordinating with RMDs, treating physicians, mid-level clinicians, and medical personnel on the facility level to review the patient's records and craft medical and legal responses. The CMO makes decisions that directly impact the health care of individual patients.

26.     Koenigsmann and Morley were responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment and medical health care policies, during their respective tenures.

27.     The CMO is charged with developing and regularly updating clinical practice guidelines in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

<u>**The Role of Regional Medical Directors ("RMDs")**</u>

28.     Dinello, Hammer, Mueller, and Bozer were also responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment.

29.     Dinello, Hammer, Mueller and Bozer were charged with developing and regularly updating clinical practice guidelines to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of

treatment.

30.     Each RMD is responsible for a "hub." A DOCCS' medical hub is a group of correctional facilities within a region. There are five hubs within DOCCS.

**The Role of MDs and Mid-Level Clinicians**

31.     MDs and Mid-Level Clinicians are the Facility Health Services Directors, treating physicians and mid-level clinicians within DOCCS' 44 facilities.

32.     The MDs and Mid-Level Clinicians are directly responsible for the healthcare of prisoners in the custody of DOCCS.

33.     The MDs and Mid-Level Clinicians are directly responsible for examining patients during sick call and scheduled examinations. Along with nurses, MDs and Mid- Level Clinicians respond to the medical complaints of patients regarding chronic pain, neurological, and other health issues.

34.     The MDs and Mid-Level Clinicians are directly responsible for referring patients out for specialist diagnostic testing including MRIs, X-Rays, and electromamyograph ("EMG") testing which assesses the health of muscles and motor neurons.

35.     The MDs and Mid-Level Clinicians are directly responsible for prescribing medications available in the DOCCS' "Formulary Book" when patient requires prescriptive care.

36.     The DOCCS' "Formulary Book," lists all the medications available for doctors to prescribe without approval from an administrator.

37.     For prisons, formularies are also established to ensure that the drugs prescribed are convenient to administer in a correctional environment and have a low potential for abuse.

38.     The 2019 DOCCS' "Formulary Book," included Neurontin as a formulary

medication. To prescribe, a provider "requires a diagnosis on the prescription;" it must be "nurse administered;" and it is "non-formulary for an O[ffice] of M[ental] H[ealth] diagnosis and use."

39.     MDs and Mid-Level Clinicians cannot prescribe medications that are "Non-Formulary" without the approval of an administrator.

40.     Historically, Non-Formulary medications included narcotics, medications "Scheduled" in accordance with the Controlled Substances Act, and medications not generally carried in DOCCS' pharmacies.

41.     Before late 2022, if an MD or Mid-Level Clinician prescribes a Non-Formulary medication he/she had to submit a Non-Formulary Request to an RMD for approval.

42.     To submit the Non-Formulary Request for approval, MDs and Mid-Level Clinicians supplied information to the RMD, including 1) Name of person requesting med, if not MD 2) whether the medication is a Consultant[or Specialist] Recommendation 3) Generic or trade name of non-formulary drug 4) dose, frequency, dosage form, quantity requested, prior approval number; 5) Condition treated 6) Other associated conditions 7) Formulary alternatives tried (must list medication, dose, frequency and duration; 8) Comments.

43.     An RMD reviewed the Non-Formulary Request and added comments along with his/her initials to show approval, along with an Approval number for tracking with the pharmacies.

### The Role of Consultants and Specialty Medical Providers

44.     MDs and Mid-Level Clinicians are directly responsible for submitting referrals for patients to outside consultants and specialists when MDs and Mid-Level Clinicians are not skilled or experienced enough to diagnose or treat specific conditions.

45.     According to Dinello, "If the patient has a medical issue that we need help

managing, we would send them to a referral, a consultant, to help us manage the case."

46.     DOCCS Health Services Policy states, "Referrals for outpatient care will be requested only when necessary medical assessment and treatment services are not available from facility primary care providers."

47.     To facilitate a Referral, an MD or Mid-Level Clinician submits a "Request and Report of Consultation" ("Referral") that includes a synopsis of the patient's particular medical issue drafted by the referring medical provider on the facility level and the reasons he/she believes a visit with a specialist is necessary.

48.     DOCCS' outside quality control provider, Kepro, then reviews the specialty appointment request and approves or denies it.  If denied, an RMD can override the denial.

49.     At the appointment, the specialist then fills out his/her findings on the bottom half of the "Referral," generally in hand.  Sometimes the specialist attaches his/her computer-generated report, like an EMG reading. The specialist report is then given to the MDs and Mid-Level Clinicians for review.

50.     The MDs and Mid-Level Clinicians personally review the reports and recommendations of specialists who treat patients.

51.     To record the fact that an MD or Mid-Level Clinician has reviewed the specialist report and recommendation, he/she initials the report with the date of review.

52.     The MD or Mid-Level Clinician then makes a notation in the patient's AHR regarding the findings and recommendations of the specialist.

53.     The MDs and Mid-Level Clinicians are directly responsible for prescribing specialist-recommended medications.

54.     Treating consultants or specialists have no ability to directly ensure prescriptions

to DOCCS' patients, they can only make recommendations to the treating MDs and Mid-Level Clinicians through their reports.

55.     According to Division of Health Services Policy 3.02 "Medication Orders Within DOCCS Facilities," procedure, "Consultants [and/or Specialists] may recommend medication treatment for inmates, but it is the responsibility of the Department's primary care provider to review the consultant's recommendations and determine the course of therapy. The facility prescriber may modify or decline the recommendations but ***must document their reasons for doing so*** in the Ambulatory Health Record."

56.     In the medical records of over 110 affected patients, **NOT ONCE** did MDs or Mid-Level Clinicians document the reasons for ignoring or dismissing the prescriptions and recommendations of outside consultants and specialists after the MWAP Policy was promulgated (or before).

**DOCCS' Medical Records Thwart Patient Care**

57.     In fact, the single biggest impediment to even basic health care within DOCCS is the health records system that allows for incomplete, inaccurate, and chaotic medical records.

58.     Patient records are kept in two places: the paper copy ambulatory health record ("AHR") kept at the facility and an electronic rendition maintained on the Facility Health Services Database ("FHS1").

59.     The AHR is maintained in two files: a small "active" file kept in the clinic with the most recent provider notes and specialty recommendations and an "inactive" file kept somewhere else in the facility in storage.

60.     Nurses or clerks often "thin" a patient's active file and take older materials to be stored in the inactive file.

61.     If a provider, RMD or CMO needs to consult with older specialist recommendations, diagnostic testing or results, he/she must get someone at the facility to go through the inactive file boxes and look for the relevant materials.  Far more often, the provider, RMD or CMO relies upon inaccurate entries on the FHS1 system.

62.     The FHS1 records are electronically stored on a network accessible through monitors in each DOCCS facility or administrative office.

63.     Through the FHS1, RMDs have limited access to a patient's history of specialty appointments, hospital stays, prescription histories, medical problem lists or specialist recommendations.

64.     The FHS1 entries are input at the facility and, generally, are incomplete renditions of the patients' medical problems, the recommendations of specialists and provider interactions.

65.     Many FHS1 entries leave out the most relevant information.  For instance, on January 5, 2018, Roderick Reyes, who suffers from sickle cell anemia and constant hospitalizations due to crises, saw Dr. Ahmed Asif, his hematologist.  Dr. Asif recommended that DOCCS' providers, "continue his original dose [of MS Contin] at 60 mg [twice a day] to keep him from going to the hospital.  For breakthrough pain use Motrin 800 mg PO [three times a day as needed].

66.     The correlating FHS1 entry for Dr. Asif's recommendation says, "[Return to Clinic] [none] no [follow-up] indicated. Recommend labs every month."

67.     Anyone reading the FHS1 entry would have no idea that Dr. Asif wanted the patient maintained on 60mg twice a day of MS Contin to keep the patient out of the hospital with sickle cell crises.

68.     These inaccuracies are rampant and all-too-common in the FHS1 system.

**Medical Intake At DOCCS**

69.     When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called "Movement and Classification" determines the best housing for the patient.

70.     The medical staff at a reception facility maintains a patient on all the medications and prescriptions he/she was taking before being "drafted in" to ensure continuity of care.

71.     The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities.  Their findings related to major disease or mobility issues are entered into the patient's Medical Problem List.

72.     Upon transfer to a facility for housing, a nurse is supposed to conduct an "assessment,' of the patient. If an prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering.

73.     MDs and Mid-Level Clinicians often do not see or examine the patient, nor do they review the medical charts before stopping or re-prescribing medications on intake. Sometimes, the patient's AHR has not even arrived with them.  As a consequence, patients lose necessary and/or effective medications without even seeing a provider.

74.     Long before promulgation of the MWAP Policy, these abrupt discontinuations of medications were based on nothing more than a facility "policy," as each FHSD and/or physician initiated his/her own preferences with little regard to continuity of care or the needs of the patient.

75.     A patient could be bounced around facilities and have his medications changed

each and every time at the whim of medical personnel once he is in the system.

76.     However, before promulgation of an MWAP Policy, if a patient was lucky and ended up at a facility with good health care practitioners, the patient could receive compassionate, appropriate and constitutionally adequate medical care, including MWAP medications to treat his/her chronic pain or neurological issues.  Unfortunately, after MWAP patients even lost a shot at the luck of the draw.

**Medications With Abuse Potential**

77.      On its MWAP list, DOCCS included a group of rather ubiquitous medications, including but not limited to the following:

78.     Ativan (generic name Lorazepam) is used to treat anxiety.

79.     Baclofen is a muscle relaxer and antispasmodic agent used to treat Multiple Sclerosis, spinal cord injuries and other spinal cord disorders. There are no other medications that work in the same way Baclofen works.

80.     Fentanyl (this is the generic name) is a synthetic opioid that is 80-100 times stronger than morphine.  It should only be used in cancer patients or others with truly unremitting pain.

81.     Flexeril (generic name "Cyclobenzaprine") is also a muscle relaxer that works by blocking nerve impulses to the brain.  Flexeril is used in short term doses to control muscle spasms.

82.     Imodium is used to treat diarrhea.

83.     Klonopin (generic name Clonazepam) is used to prevent and control seizures, as well as treat panic attacks.

84.     Lyrica (generic name "Pregabalin") is used to treat fibromyalgia, diabetic nerve pain, spinal cord injury nerve pain and other nerve related pain symptoms. Lyrica is often prescribed in lieu of Neurontin or when Neurontin fails for any number of reasons.[2] Lyrica is a scheduled medication.

85.     Marinol (generic name Dronabinol) is a man-made form of cannabis used to treat appetite issues, severe nausea and vomiting.

86.     MS-Contin (also referred to as Morphine Sulfate, MSSR, Morphine Elixir) is an opioid analgesic used to treat acute and chronic, severe pain.

87.     Neurontin (generic name "Gabapentin") is an anticonvulsant generally taken to control seizures. It is also often prescribed to relieve nerve pain and considered an alternative to Lyrica.[3] Historically, in DOCCS, a patient is prescribed Neurontin if an EMG test shows neuropathy.

88.     Percocet is a combination of oxycodone and acetaminophen used to treat moderate to severe pain.

89.     Phenobarbital is a barbiturate that slows the activity in the brain and nervous system and is used to treat or prevent seizures.

90.     Robaxin (generic name Methocarbamol) is a muscle relaxant used to treat skeletal muscle conditions and spasming.

91.     Tylenol #3 (Tylenol-Codeine) is used to relieve mild to moderate pain.  It does contain an opioid pain reliever (Codeine).

92.     Ultram (generic name "Tramadol") is a pain management medication used to treat moderate to moderately severe pain in patients.  The dose should be individualized to a patient's needs and a patient should not take more than necessary to control his/her pain.  Ultram

is considered a lower risk alternative to Percocet or other narcotics or opiates.

93.     Vimpat (generic name Lacosamide) is used to treat partial-onset seizures.

94.     Xanax (generic name Alprazolam) is used to treat anxiety and panic disorders.

95.     Xarelto (generic name Rivaroxaban) is used to reduce the risk of stroke.

96.     Zanaflex (generic name Tizanidine) is used to treat muscle spasms caused by conditions like multiple sclerosis and spinal cord injuries.

97.     These medications are not risk free. Like any medication they can be abused, but many of them – including Neurontin and Lyrica -- are considered to have low addiction potential.

98.     The use of the medications DOCCS deemed MWAP certainly engenders some risk.

99.     In fact, DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades.

100.    DOCCS' physicians and nurses have submitted at least 41 sworn declarations in federal district courts in the Second Circuit since 2006 discussing the dangers of Neurontin and Ultram within the prison population due to risk of abuse.

101.    Nonetheless, like all physicians, DOCCS physicians and mid-level clinicians continued to prescribe the medications when appropriate as effective treatment for patients' ailments.

102.    To adapt to the risks of diversion and abuse, DOCCS developed a number of policies over the last twenty years including 1) the administration of the medications one-on-one, meaning a nurse watches as the medication is taken by a patient; 2) the crushing and dilution in water so a patient must drink the medication; and, most recently, 3) the administration of

certain medications, including Neurontin, in liquid form.

103.     DOCCS can also (and sometimes does) administer a simple blood test that measures the amount of certain MWAPs in a patient's blood stream, as well as the presence of any other illicit medications or drugs. This allows doctors to tell whether a patient is diverting medication or is at risk of negative interactions with other medications or drugs.

104.     If an RMD, MD or Mid-Level Clinician is concerned about an individual patient's diversion or misuse of MWAP medications, he/she can easily request a blood test to confirm or deny the concerns.

105.     And the inclusion of some of the medications on the MWAP List is just plain ridiculous.  Dr. John Bendheim testified under oath that he could not get Imodium for a patient to abate severe diarrhea.  The patient had to suffer.  It is of note that Imodium is abused when it is taken in very large quantities.  DOCCS patients do not have access to the amount of Imodium it would take to get high.

**Standard of Care in the Correctional Environment**

106.     As implemented, the MWAP Policy was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care.  A complete ban on use to treat chronic conditions does not comport with the standards adopted by other prison systems or the Standard of Medical Care in the community.

107.     For instance, NYS DOCCS is an accredited member of the National Commission on Correctional Health Care ("NCCHC").

108.     In 2018, the NCCHC published a position statement on "Management of Noncancer Chronic Pain."

109.     The position states, "Because complaints of chronic pain are common in

corrections, corrections clinicians must address the challenges presented. The use of adjunctive medications such as opiates or GABA analogues [these include Neurontin and Lyrica] is particularly troublesome in the correctional environment because of very high percentage of inmates have a history of substance abuse, chemical dependency, and misuse of prescription medications . . . On the other hand, the confinement environment provides opportunities to obtain information (e.g., a patient's physical activities in the housing unit, at recreation, and at work) that can be important when assessing function and when reviewing the efficacy of treatment . . . Therefore, when patient function remains poor and pain is not well controlled, and other options have been exhausted, a therapeutic trial of medication, including opioids, should be considered.   Clinicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain). Rather clinicians should consider all aspects of the problem and all available proven modalities."[4]

110.    In its further statement, NCCHC recommended: "Chronic pain should be addressed like other chronic medical conditions, in a systematic, objective, structured manner beginning with diagnosis and treatment planning and proceeding with structured and regular monitoring of progress. Clinicians should establish measurable treatment goals for chronic pain and measure progress against them. . . They must be functional in nature, measured against the patient's established baseline . . . Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, including pain management, should be available for patients whose function and chronic pain are not improved with treatment… Policies banning opioids should be eschewed.  Opiates should be considered with caution after weighing other treatment options."

111.    In June of 2018 the Federal Bureau of Prisons ("BOP") published its "Pain

Management of Inmates," Clinical Guideline.[5] Even the BOP clinical guideline does not prohibit the use of opioids or neuromodulating medications like Lyrica and Neurontin.

112.    The BOP Clinical Guideline lists Neurontin and Lyrica as second line treatments for neuropathic pain after TCA and SNRIs.[6]

113.    DOCCS is also accredited by the American Correctional Association ("ACA"). The ACA website lists the BOP's Clinical Guideline, "Pain Management of Inmates," as its clinical guideline standard.[1]

114.    In fact, The New York State Department of Health has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment.

115.    The American Medical Association ("AMA") also does not restrict the prescription of many of the medications on the MWAP list and Koenigsmann knew that.  In an October 27, 2017 email he wrote, "Except for expanding the limitations to some highly abused non-opiate medications nothing in the MWAP is outside of DOH and national recommendations for prudent opioid use."   Opioid abuse was one thing, Koenigsmann and Dinello knowingly restricted medications far beyond any restrictions found in the community.

116.    In fact, the AMA House of Delegates is focused on removing barriers to treatment and appropriate analgesic prescribing for pain management.  The AMA House of Delegates has directed the AMA to actively lobby to have Medicare and Medicaid Services

---

[1]https://www.aca.org/ACA_Prod_IMIS/ACA_Member/Healthcare_Professional_Interest_Section/HC_ResourceLibr aryHome.aspx?WebsiteKey=139f6b09-e150-4c56-9c66-284b92f21e51&hkey=6e0f7ed7-c302-4679-9dc6-013fc2b62810&New_ContentCollectionOrganizerCommon=2#New_ContentCollectionOrganizerCommon

allow for reimbursement of off-label prescription of medications, including Neurontin, "at the lowest co-payment tier for the indication of pain so that patients can be effectively treated for pain and decrease the number of opioid prescriptions written."

117.    The standard in the medical community is to use medications like Neurontin, Lyrica and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions.  The standard in the medical community is not to restrict all effective treatment.

118.    The reality is that incarcerated patients have a higher-than-average prevalence of disease, as well as substance use disorders and psychiatric illness, often in combination.[7]

119.    Prison populations also have a higher than normal incidence of patients with major spinal cord injuries, due to traumatic events and gun violence.

120.    Treatment protocols are also necessarily different in prisons. Diet modification, exercise and non-medicinal treatments are not as available. Patients in prisons often wait months to see specialists, receive diagnostic testing, surgeries and follow-up care.

121.    Therefore, pharmaceuticals, which already play an important role in the U.S. health care system, may take on an even greater therapeutic importance in prisons.

122.    A December 2017 Pew Charitable Trust study found that use of prescription drugs in the prison population may decrease total medical costs because appropriate use of prescription drugs can avert even more expensive unplanned hospital admissions.

123.    Unlike many of the medications on DOCCS' MWAP list, many psychiatric drugs are 'low cost' due to their availability of reasonable lower-costs psychotropic alternatives and the drop in the high price of some older ones due to these drugs coming off patent during the last several years.

**Policies Before The MWAP Policy Implementation**

124.   Before the MWAP Policy, DOCCS' physicians, including the RMDs, already had troubling "policies" regarding MWAPs.

125.   The more punitive MDs and Mid-Level Clinicians would stop a patient's medications for reasons totally unrelated to patient care. If the patient does not show up at the medication window or if the patient is accused of diverting or abusing medications, the prescriptions could be discontinued with no notice. Medical providers discontinue medications without any investigation into the alleged incident or exploration of why a patient might be missing medication window visits.

126.   Sometimes a brave patient sued for deliberate indifference to his/her medical needs when necessary, effective medications were abruptly discontinued.

127.   DOCCS' defendants repeatedly rolled out two justifications for stopping a patient's MWAP medication. They signed declarations that asserted: 1) the patient is a drug addict or abuser, or, 2) the DOCCS defendant listed each and every time an Ambulatory Health Record entry exists for the patient, implying because he/she was seen by a health care practitioner there was no deliberate indifference.[10]

128.   Dr. Janice Wolf, a DOCCS doctor, summarized DOCCS' position best in an email to RMDs, "[So long as the patient] is seen within a reasonable amount of time, complaint addressed, exam documented, and rational for medical decision made [we're safe]. Hopefully, the A[ttorney] G[eneral]'s office will defend us this way."

129.   DOCCS doctors report being told on many occasions that as long as they "prescribe Tylenol" their actions could not be considered deliberate indifference.

130.   In fact, Dinello repeatedly told various DOCCS' providers not to worry about

lawsuits because the "lawyers take care of it."

131.    A sampling of 133 public *pro se* prisoner cases alleging deliberate indifference for the revocation of Neurontin or Ultram by DOCCS physicians in the Second Circuit demonstrate that the Attorney General's office systematically submitted a standard declaration signed by a DOCCS medical provider accusing the *pro se* plaintiff of diversion, drug abuse, or hoarding.

132.    In every single sampled case the pleadings were dismissed due to the *pro se* prisoner's inability to rebut the accusations.

133.    In another large sampling of *pro se* Eighth Amendment cases a DOCCS medical provider will outline in a declaration the number of times a patient was seen by some sort of medical provider, creating the guise that the patient had been treated merely because there was interaction with health care staff.

134.    DOCCS decided to solidify these unconstitutional actions into the MWAP Policy.

**Development of the MWAP Policy**

135.    In 2006, Dinello was working as an emergency room physician in area hospitals and began working for DOCCS part-time as well.

136.    He soon ran into trouble.  In 2007 and 2008 he failed to treat patients in the Auburn Emergency Room before discharging them.

137.    Arguably in response to Dinello's malpractice issues, he started a company that offers drug-testing and evaluations of employees – services that do not require a medical license.

138.    He also started to pursue his "passion" for addiction issues, an area of medical practice for which he received no additional or specialized training.

139.    In 2010, the New York State Department of Health State Board of Professional Medical Conduct charged Dinello with three counts of failing to adequately evaluate patients prior to discharge from an emergency room.

140.    In Dinello's words he was, "accused of not ordering additional testing or prescribing medications for patients."

141.    Dinello plead guilty and was prohibited from practicing emergency medicine again and sentenced to three years' probation for the practice of non-emergency medicine, during which time he was to be monitored by another doctor.

142.    The Commonwealth of Pennsylvania followed suit and placed Dinello on probation with an adjudication and order dated May 5, 2011.

143.    Despite these very serious charges and adjudications, DOCCS named Dinello Chairman of its Pharmacy and Therapeutic Committee in which role he crafted policies and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients.

144.    Unbelievably, Koenigsmann allowed Dinello to draft a new policy on Medications With Abuse Potential ("MWAP"), despite the fact that Dinello had no specialized addiction training, no pain management training, and was stripped of his emergency medical license for not properly evaluating or treating patients.

145.    Dinello wrote the policy in rough form in 2015 and Koenigsmann promulgated it on June 2, 2017.

146.    On September 10, 2018 Koenigsmann signed a revised version of the MWAP Policy.

147.    But there were earlier versions and efforts related to the MWAP Policy that

resulted in the discontinuation of a patient's effective pain or neuropathic pain management medication before June 2, 2017.

148.    Doctor Michelle Belgard, the Facility Health Services Director at Five Points, who worked directly under Dinello, testified under oath in 2016 that Dinello had already targeted Neurontin, Baclofen, Lyrica and any scheduled medications. She testified, "we no longer prescribe Morphine, Percocet, or [Ultram] . . . we are trying to remove those medications."

149.    Of Neurontin in particular she testified, "[Dinello] is currently trying to change the policy on the use of Neurontin to limit its use."

150.    Dinello has also testified under oath that "in the prisons I took care of, this was something I was already doing as a health care provider."

151.    In fact, the medical personnel in several facilities in Dinello's "hubs" tell patients repeatedly, "you cannot get that medication here," or "we do not use that medication," or "we do not give that."  This is especially true at Groveland, Franklin, Five Points, Elmira and Marcy Correctional Facilities – all controlled by Dinello.

152.    Certain RMDs and facilities started rolling out the MWAP restrictions and policy implementation well before the Policy was actually promulgated by Koenigsmann.

153.    The reports of Senior Utilization Review Nurse's ("SURN") conducted on the facility level between 2015-2018 show that the facilities were keeping track of how many patients were still taking medications such as Neurontin or narcotics and counting down month to month until the facility reached zero patients.  The reports show the systematic elimination of certain medications from prisons.

154.    In fact, Dinello started refusing approvals of the MWAPs on "Non-Formulary" Request forms from treating MDs and Mid-Level Clinicians in his HUBs as early as 2015.

155.     On March 23, 2017, Koenigsmann sent an email to all Facility Health Services Directors and Nurse Administrators and asked that they "provide this memo to all primary care providers."  He wrote, "The Division of Health Services will be issued a Health Services Policy regarding medications with abuse potential in early summer (does not apply to reception or classification centers).  This is in response to the devastating nationwide epidemic of substance abuse and addiction and is in accordance with AMA guidelines.  The policy will limit the use of controlled substances along with medications that have significant abuse potential within DOCCS.  The policy will also restrict where the patients can be housed. . . This notice is being sent in advance to allow providers to reevaluate patients on the medications and begin to make appropriate changes in anticipation of issuance of the policy."

156.     Accordingly, some providers in facilities not already targeted started discontinuing MWAP medications from patients regardless of need.

157.     Once the MWAP Policy went into effect, a provider would no longer submit a "Non-Formulary drug request" for a MWAP medication. She or he would submit an MWAP Request Form.

158.     Under the MWAP Policy, an MD or Mid-Level Clinician submitted the MWAP Request Form to the RMD in charge of his/her "hub."

159.     The MWAP Request Form asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue.

160.     The MWAP Request Form also asked if there is any recent evidence of drug diversion or abuse by the patient.

161.     To conduct a review of the MWAP Request Form, the RMDs had access to the

limited portions of the patient's medical history available on the DOCCS' FHS1 database, but rarely undertook even that review.

162.    RMDs did not have access to the patient's personal paper AHR which is kept at the facility where the patient is in custody.

163.    Based on the MWAP Request Form contents -- the RMD and not the patient's medical provider -- determined whether a patient will receive an MWAP.

164.    In 2018, under oath, Dinello was asked whether the MWAP Policy would force a facility doctor to discontinue MWAP medications that were effectively treating patients.

165.    Dinello responded, "That was up to them. That's the individual provider's prerogative, I assume."

166.    This response was categorically untrue.  MWAP was a "policy" and not a practice guideline.

167.    MDs and Mid-Level Clinicians within DOCCS had to discontinue an MWAP prescription if it was not approved by the RMD. The pharmacies would not fill a prescription for an MWAP without RMD approval.  An MD or Mid-Level Clinician had no ability to provide the medication once an RMD refused to approve the prescription.

168.    Koenigsmann testified under oath, "A policy requires adherence. A practice guideline is a guideline; it's a recommendation for care. . . The regional medical directors felt strongly that this should be policy, that it required adherence by the providers, not as guidance."

169.    Defendants knew the new MWAP Policy violated constitutional rights.

170.    In an internal DOCCS email to Dinello, Koenigsmann wrote, "[I]n discussions, grievance responses, et cetera, we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy. Changing meds based on policy

is doomed to failure . . ."

171.   When asked if he meant, "doomed to failure legally," Koenigsmann responded, "I did mean that.  And I also meant that for the providers --- and this was my reservation originally for thinking of a practice guideline versus a policy, was it's difficult with licensed clinicians to dictate how they provide care. And this being a policy, we do require that they have to prove certain things before they're able to prescribe these medications, and that's different from out in the free world. There are not similar limitations on providers."

172.   Koenigsmann added the MWAP Policy was "never designed to eliminate any specific med, medication, or class of medication from its use. It was only to ensure that we have proper oversight over the clinicians ordering the medications."

173.   But the policy did not operate to create "oversight," it had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs, including patients who suffered from epileptic seizures, Multiple Sclerosis, phantom pain, major spinal injuries, and other sources of chronic pain.

174.   Koenigsmann testified that it was possible that the MWAP policy could have the effect of discontinuing effective medical treatment to patients.

175.   In fact, many conscientious DOCCS MDs and Mid-Level Clinicians challenged the policy, especially the suggestion that patients with chronic pain issues should be treated with psychiatric medications to numb them and "drug them up."

176.   The current CMO of DOCCS, Dr. Moores testified under oath that approximately 80% of the DOCCS providers she spoke with opposed the MWAP policy.

177.   A review of the medical records of DOCCS' patients shows consistent patterns of medical providers fighting the RMDs when their patients were stripped of effective MWAP

medications. The MDs and Mid-Level Clinicians also attempted to exploit loopholes to get their patients necessary care.

178.    Under the MWAP Policy an MD or Mid-Level Provider could prescribe five (5) days of an MWAP medication without RMD approval.

179.    Medical providers within DOCCS sometimes used this five-day loophole to get patients in severe chronic pain at least five days of relief in facility infirmaries.

180.    Medical providers checked patients with chronic neurological or other chronic pain issues into facility infirmaries for "pain control," meaning the providers were administering the five days of pain management they could get without MWAP approval from an RMD.

181.    The truth was that after June 2, 2017 RMDs repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need of medications to effectively treat chronic pain, nerve, and other health issues, no matter the recommendations of treating providers and specialists, nor the patient's individualized medical needs.

182.    When patients asked their medical providers or submitted inmate grievances the responses were invariable that "Albany" had refused the prescriptions in accordance with 'policy.'

183.    Patients had no available avenue for appeal when their effective medical treatment was discontinued.  All methods of appealing unconstitutional medical care lead to an inevitable dead end that recommends the patient, "use the established sick call procedures" so he/she can go back and speak to the very provider that discontinued the medications.

**There is No Redress For A Patient When Effective Medical Treatment Is Discontinued or Denied**

184.    There are two direct possible avenues of redress for a suffering DOCCS' patient:

1) the inmate grievance system; or 2) letters to the Chief Medical Officer – written by the patients themselves, their legal advocates, or third parties appealing on behalf of patients, like state politicians and members of the clergy who work in the prisons.  These are both dead ends.

**The Inmate Grievance Program Is Unavailable**

185.    The Inmate Grievance System is established at 7 NY CRRR 700 *et seq*. and was intended to be "an orderly, fair, simple and expeditious method for resolving grievances…"

186.    However, the NYS Inmate Grievance System has not been timely administered in several years.

187.    A grievance is supposed to start at the facility's Inmate Grievance Review Committee ("IGRC").  An inmate files a grievance and it is heard by a facility IGRC.  If an inmate is dissatisfied with the IGRC response, he/she must then appeal to the Superintendent.

188.    However, it is the Inmate Grievance Program director who drafts the response for the Superintendent.  The very staff member who denied the grievance in the first place then drafts what is supposed to be the decision on the appeal from that very decision.  Once the Superintendent "renders a decision," an inmate must appeal the Superintendent's decision to the Central Office Review Committee ("CORC").

189.    Pursuant to 7 NYCRR 701.5, the CORC consists of seven high-ranking DOCCS' administrators or their designees, including a member of the Office of Counsel, charged with defending DOCCS from lawsuits.

190.    Pursuant to 7 NYCRR 701.5(3)(ii) "CORC shall review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the grievant, the grievance clerk, the superintendent, and any direct parties within thirty (30)

calendar days from the time the appeal was received."

191.   An inmate cannot file a cognizable lawsuit in federal court unless he has fully exhausted his administrative remedies and received a decision from CORC.

192.   Not one of those grievances has been answered by CORC within thirty (30) days. In fact, almost all of the grievances filed after 2017 were not even answered within a year.

193.   By way of example, Peter Allen filed a grievance that was received by CORC on November 17, 2017.  CORC rendered a response on January 30, 2019 – over fifteen (15) months later.

194.   Brian Bernard filed a grievance that was received by CORC on December 12, 2017.  CORC did not respond until January 23, 2019 – over thirteen (13) months later.

195.   Shannon Dickinson filed a grievance on March 9, 2018 that was not answered by CORC until August 7, 2019 – over seventeen (17) months later.

196.   Shannon Dickinson filed a grievance on April 11, 2018 that was not answered by CORC until October 2, 2019 – over eighteen (18) months later.

197.   Shannon Dickinson filed a grievance on April 16, 2018 that was not answered by CORC until October 9, 2019 – almost eighteen (18) months later.

198.   Shannon Dickinson filed a grievance that was received by CORC on July 31, 2018 that was not answered until October 2, 2019 – over fifteen (15) months later.

199.   Aaron Dockery filed a grievance on September 26, 2017.  CORC did not respond until January 30, 2019 – sixteen (16) months later.

200.   John Gradia filed a grievance on September 12, 2017; he did not receive a response from CORC until December 12, 2018 – fifteen (15) months later.

201.    Sean Pritchett filed a grievance on October 3, 2017; CORC did not render a decision until April 17, 2019 – almost eighteen (18) months later.

202.    Rashid Rahman filed his grievance on July 5, 2017; CORC did not answer until February 20, 2019 – over nineteen (19) months later.

203.    Plaintiff's counsel currently possesses over seventy (70) CORC responses to patients.  Not one was responded to in less than a year.

204.    In sworn testimony, Morley was asked, "[When a patient] file[s] a grievance, and let's pretend [his] pain medication has been discontinued and [he's] in a lot of pain, according to [him]. So [he] file[s] a grievance, but [he doesn't] get a response for 14 months; do you think that's an appropriate avenue for a patient to address what he perceives to be a pressing medical issue?  Dr. Morley answered, "No."

205.    And the delays will not improve.

206.    In a sworn declaration submitted in April of 2020 to Judge Sannes of the Northern District of New York, Rachel Sanguin, DOCCS' Assistant Director of the Inmate Grievance Program for DOCCS, stated, "During calendar year 2019, there were approximately 8,090 grievances appealed to CORC….the voluminous number of appeals, correspondence, and record requests received by CORC has contributed to the delay."

207.    Not one grievance regarding medication was found in favor of the patient.  Each and every response from CORC starts with the statement: "Grievant's Request Unanimously Accepted In Part" – yet, nothing the patient grieved was 'accepted,' addressed, or fixed.

208.    In fact, CORC uses that header, "Request Unanimously Accepted In Part," to then categorize the grievance as having been found "in favor" of the grievant.  This false labeling

is used to artificially inflate the numbers on DOCCS' Annual Grievance Reports. DOCCS' Annual Inmate Grievance Reports for 2016, 2017 and 2018, respectively, suggest that 35.3%, 36.7% and 32.2% of grievances have been decided "in favor of the grievant," but that is not even close to the truth.

209.   Worse, all the medical grievance responses from CORC say the same thing. They start, "Upon a full hearing of the facts and circumstances presented in the instance case and upon the Recommendation of the Division of Health Services, the action requested herein is accepted in part."

210.   The grievance responses all continue, "CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff, who advise that a complete investigation was conducted and he is receiving appropriate treatment."

211.   Then some responses contain a few notes specific to the patient which are nothing more than a rendition of the FHS1 provider entries from the last few months listing the times a grievant has allegedly met with health staff.

212.   In late 2018 and 2019 CORC started adding a segment about MWAP to some of the grievance responses, "CORC asserts that all inmates will have access to medically appropriate medications, and that the RMD is required to review and approve the use of potentially unsafe medications that have abuse potential as outlined in HSPM #1.24. CORC continues to uphold the discretion of the provider to determine the type and necessity of medication administered and finds no compelling reason to revise HSPM 1.24 at this time."

213.   The provider, of course, had no discretion to determine the type and necessity of medications administered – only an RMD had that discretion under MWAP.

214.   Then each grievance ends, "With respect to the grievant's appeal, CORC finds

insufficient evidence of improper care or malfeasance by staff and advises him to address further

medial concerns via sick call at his current facility."  Sometimes this sentence ends, "via sick

call procedure."

215.    Every single grievance is denied in fact and then ends with a line that the grievant

should go back to the very same medical providers who perpetrated the delay or denial of

medical care in the first place.

**Patient Appeals to the Chief Medical Officer Do Not Work**

216.    Patients within DOCCS' care who require medical treatment can also write the

Chief Medical Officer – currently Dr. Moores, but formerly Koenigsmann or Morley.

217.    Hundreds of patients each year and/or their advocates -- whether lawyers, family

members      or      others      --      wrote      Morley      (before      late      2018

Koenigsmann) seeking the intervention of someone they perceived to be not only "in charge"

but capable of helping them with their pressing medical needs.

218.    Just for the 110 patients, over one hundred advocacy letters were written to the

Chief Medical Officer's Office by the patients themselves, lawyers from Legal Aid Society,

Prisoners Legal Services, and smaller law firms, politicians, clergy members, and family

members on behalf of patients injured by medication discontinuation policies and practices.

219.    Not once did the Chief Medical Officer intervene on behalf of a patient.

220.    In fact, in sworn deposition testimony Morley called the advocacy letters and

requests for help, "complaints"…and "accusations" ….written because "things are not going the

way [the patients] would like them to."

221.    Morley described the process, "so complaints will come into my office and I read

the complaint and then forward it on to the person who oversees the [Regional Health Services Administrators ("RHSA")] and they will contact the facility and respond to the complaints."

222.    Morley added, "I'll write a couple of notes and initial it at the top and forward it to the RHSA for resolution.  Sometimes I do that via e-mail, sometimes I do that just by passing it on to my secretary who then brings it to the person overseeing the RHSAs."

223.    Morley testified, "the process was passed on to me [by Koenigsmann] when I arrived that this is what we do . . . I just know that I've read the complaint and it needs a response and someone else is going to respond to it."

224.    Morley sometimes contacts the nurse administrator of the facility or the physician, the Facility Health Services Director "what are your thoughts on this case?"  But when he asks these questions, Morley testified that he never turns the responses over to the RHSAs answering the letters so they might help the patient.

225.    Dr. Morley testified under oath, "I can't think of anytime that anybody ever came back and said, "yes [the complaint has merit] they will – I think, I think 100 percent of the time the response is significantly different than the accusations that are in the complaint."[2]

226.    When asked if those very same nurse administrators or providers might have "an incentive not to tell the truth" about a patient's care, Morley replied, "any person is more than capable and has an incentive not to tell the truth."

227.    Even when Rabbi Frank Maxwell directly emailed Koenigsmann on behalf of Plaintiff John Gradia, the Rabbi communicated that Mueller had rejected the recommendation of the pain management specialist to prescribe 100mg of Ultram.

---

[2] To be fair, after a break and a conversation with his counsel Morley suddenly remembered, "a couple of cases where somebody identified an issue and there was a problem, yes."

228.    Koenigsmann dismissively replied, "This patient is under the care of pain specialists and has a future appointment scheduled.  Ultram is an addicting agent which is not appropriate for long term management of pain syndromes as is the trend in the community.  The focus of pain management is not complete pain relief but to regain and maintain function.  If the patient is able to carry out his activities of daily living that is successful treatment."  Mr. Gradia was receiving no relief and the lack of treatment was substantially affecting his activities of daily living.

229.    Plaintiff's counsel possesses almost 100 letters from the Chief Medical Officers to patients who lost their effective medication and appealed to the CMO for help.  In **EVERY SINGLE RESPONSE** whether to lawyers, family members or the patient, no help is offered and the letter ends the exact same way: "It is suggested that [you/patient] continue to bring [your/his] medical concerns to the attention of the health care staff using the existing sick call procedure.  I am sure they will make every effort to address [your/his] needs."

230.    Letters to the Chief Medical Officer are nothing more than a dead end for patients requiring help with pressing medical needs, including the discontinuation of effective pharmaceutical treatment.

231.    Unfortunately, letters to outside agencies requesting help on behalf of a DOCCS' patient are just forwarded to the CMO for the same treatment.

232.    An accurate depiction of patient avenues for help with pressing medical issues is attached as Exhibit 1.

233.    While a patient attempts to pursue these dead ends, he/she suffers.

**Koenigsmann and Morley Utterly Failed To Respond To Bona Fide Complaints of Patient Suffering Due to MWAP**

234.    Despite years of complaints, concerns, and public comment on the devastating impact MWAP was having on patient care, Chief Medical Officers never did anything to correct it.

235.    On October 30, 2017 the New York State Assembly Committees on Health and Corrections had a public hearing on "Healthcare in New York Correctional Facilities."

236.    Both Commissioner Annucci and Koenigsmann were present for the proceedings.

237.    Annucci himself testified that the top grievance at Albion Correctional Facility was for discontinuation of Neurontin which he erroneously labeled "an extremely dangerous opioid." [3]

238.    Koenigsmann added the medical grievances that year focused on "[patients wanting] a specific medication over another, want[ing] a specific provider over another...."

239.    At the same hearing, Stefen Short, Esq. of Legal Aid Society's Prisoner Rights Project testified about the devastating impact MWAP was having on patients.

240.    Mr. Short started, "blatant skepticism [results in] a failure to exercise competent medical judgment, manifest by the failure of staff to order care recommended by specialist, undue influence by security personnel, and arbitrary reversals of treatment decisions upon facility transfer…"

---

[3] It is of note that Annucci had already read an injunction issued in the related case *Medina v. Buther, et al.,* 15-cv-1955, as the Court ordered Defendants' counsel to deliver the decision to him at an April 13, 2017 pre-trial conference.  And, of course, Neurontin is not an opioid.

241.    Mr. Short continued, "we are concerned that [MWAP} has resulted in blanket denials of certain prescription medications without patient centered assessment of prognosis, need or alternative treatment….to that end, we call on the department to review its implementation of policies regarding pain medication to ensure that patient centered determinations are being made and patients pain is adequately treated."

242.    In fact, no one at DOCCS, including the Koenigsmann, did anything to help patients.

243.    Morley has testified that no data was ever culled, no audits were conducted, and he NEVER SPOKE WITH EVEN ONE PATIENT.  This bury head in sand leadership style meant injury to hundreds, if not thousands, of patients.

244.    Despite hundreds of letters to the Chief Medical Officers, hundreds of grievances, hundreds of letters from legal advocates, public testimony, and the SDNY's various decisions in *Medina II*, no one at DOCCS ever revisited the MWAP policy or its harmful impact on patients.

245.    In fact, just the opposite occurred.  Good doctors who stood up for their patients were demoted, berated in emails, denied the ability to treat their patients, constructively fired and several took early retirement.

246.    By far, the most vulnerable and at-risk patients are housed in Regional Medical Units ("RMUs").

247.    Chronically and terminally ill patients are transferred to RMUs because they cannot care for themselves and/or require constant medical attention.  Many are transferred to RMUs for palliative care.

248.   Patients in an RMU have a "treatment team" consisting of nurses and doctors who provide for their medical needs and follow their cases.  The treatment teams meet on a regular basis to discuss the patient's case – including progress, needs and appropriate medication.

249.   MWAP destroyed the ability of treatment teams and medical providers at RMUs to treat their chronically and very seriously ill patients effectively.

250.   A team of very well-trained doctors working at the Walsh RMU vocally and actively advocated for their patients when Dinello started refusing and discontinuing MWAP prescriptions for their very ill patients.

251.   In late 2016, when Dr. Robert Burdick, a physician at the Walsh RMU, started challenging Dinello's refusals of Non-Formulary requests, Dinello had him transferred to Marcy Correctional Facility.

252.   On February 10, 2017 Dinello sent Dr. Burdick a taunting email, "I trust you are adjusting to your new role as a physician in a Medium Facility.  Please keep in mind that Marcy CF is not like the Walsh RMU…. The use of controlled/scheduled and restricted medications like Neurontin, Flexeril, Baclofen are used very sparingly…I will be releasing an introduction to the new Health Services 1.24 Medications with Abuse Potential (MWAP) Policy soon…. Most facilities are already transitioning their patients off of these medications…also, given that the acuity [in Marcy patients] is much lower, there is less of a need to order numerous testing and follow-ups.  The majority of the care [at Marcy] is primary in origin which is something you are well versed in.  In addition, the physicians at Marcy CF and other similar facilities have been encouraged to handle most of the day to day themselves. … For some providers it is taking time to adjust but for the most part they are doing just fine.  I am sure you will as well…. I believe the

environment at Marcy CF should be fairly relaxing in comparison to your previous assignment. …
Have a great weekend!"

253.   The message was clear.  If you challenged Dinello or his new policy, you would be removed and/or demoted.

254.   Burdick was undaunted and continued to challenge Dinello when he felt it was in the best interests of his patients and their care.

255.   Remaining doctors at Walsh RMU, including Dr. Michael Salvana, the Medical Director, Dr. Stephen Smith, Dr. Kesava Potluri, and Dr. Subbarao Ramineni, all fought the MWAP Policy and Dinello's unwarranted restriction of medications for truly sick patients.

256.   On June 8, 2017 Amy Tousignant, then Deputy Superintendent of Healthcare at Walsh, wrote Dinello and cc'd all the members of the Walsh RMU team.  She requested an exception for the RMUs given the severity of patient medical needs and the time it took to complete the forms.  She cautioned, "Patients will suffer in pain and finally the nurses are being placed in a tough spot to address the medication needs not being met."

257.   In July of 2017, Dr. Salvana wrote a detailed letter to Assistant Commissioner Charles Kelly, Executive Assistant to Commissioner Annucci, about the catastrophic suffering of patients at Walsh RMU for whom Dinello denied MWAPS, including: 1) an inmate with epilepsy who…was well controlled with Neurontin.  He had been on Neurontin for over 10 years but Dinello denied it and suggested the use of medications that had been tried and failed; 2) and inmate with sickle cell anemia with necrotic hip and shoulder joints who almost died during a sickle cell crisis and was denied morphine and Neurontin; 3) a patient with severe chorea, as a result of being treated with L-Dopa for Parkinson's disease was denied Ativan by Dinello.  Ativan was the only medication that effectively treated his uncontrollable movement.  Since the medication was

stopped, the patient had been found falling out of bed and could not care for himself; 4) an innate with epilepsy who was denied Vimpat on multiple occasions.  Finally, after three hospitalizations Dinello finally approved the medication; 5) an inmate with T-7 vertical fracture was denied a low dose of as needed Percocet to control his pain; 6) an inmate with cerebral palsy and spinal deformity was also denied a low dose of Percocet for pain control; and others.

258.   Dr. Salvana also mentioned patients with diabetic neuropathy with positive EMGs who could not get Neurontin to control their neuropathy.

259.   When Koenigsmann saw the letter, he emailed Dinello, "Apparently, Walsh RMU has elevated their MWAP issues to the HUB superintendent who, in turn brought them to the Commissioner.  I need you to comment on each of the attached cases so I can respond to the inquiry."

260.   Nothing substantial came of the concerns of the Walsh RMU staff – they were ignored.

261.   The MWAP Request forms from Walsh RMU doctors show that Dinello categorically denied MWAP Requests unless the patient was palliative (or near death).   In response, doctors started adding, "Patient DNR," "patient dying ca[ncer]," just to get simple medications.

262.   Still, Dinello denied MWAP Requests for patients with "end stage COPD," urothelial cancer that had metastasized, late-stage AIDs, lung cancer that had metastasized and other painful disease and conditions.

263.   In August of 2017, Mary Koury, DOCCS Statewide Director of Pharmacy Services, wrote an email to Dinello, Koenigsmann, and Joan Smith who served alongside Koenigsmann memorializing notes from a meeting with doctors regarding MWAP.  She noted, "Many reports of

push back from MDs…lots of potential litigation.  Some already seen especially in situations where a specialist has ordered an MWAP drug.  In general most reported being all for it for general population….[but] question feasibility in RMU setting especially in terms of chronically ill patients."

264.    Koenigsmann and Dinello did nothing for the RMU patients.

265.    In September of 2017, Dr. Stephen Smith fought back when Dinello discontinued Neurontin for one of his patients.  He wrote, "Since 1200 mg is working in this individual and ortho suggested [it], why do you want me to wean him off?  You suggest pain management but they are only going to tell me to place him on meds for pain control….from your printout on medications to use for neuropathic pain, I am cutting and pasting the reference to Neurontin below….The above is directly from the article you sent us.  So, if I wean the inmate off the Neurontin, he will again be in pain.  Plus, sending him to pain management will only get us with another RX for pain meds."

266.    In October of 2017, Dr. Salvana demanded a meeting with Koenigsmann out of his great concern for the patients.  He prepared a list of patients and their unfilled medication needs due to MWAP.  In anticipation of a meeting, he sent his list to Koenigsmann.

267.    Dr. Salvana wrote, "I am contacting you before your planned visit on November 1, to let you know that the MWAP policy at Mohawk and Walsh RMU continues to create significant problems in the management of our patients and in administering proper community standards of care. This involves all of our medical doctors who are all internists, most of whom have done additional training."

268.    Dr. Salvana then detailed Dinello refusing prescription of Percocet because, "'the continuation of opiate analgesia for this chronic non-palliative issue will make post-operative pain

management extremely difficult."  This statement from Dr. Dinello is nonsense and as a result the patient suffers…if you disagree with this then perhaps we can consult an outside agency, who can reassure us that we are giving proper care."

269.   Koenigsmann responded, "I feel that the MWAP process is critically important to DOCCS to be in line with what is occurring in the community to get control of the opioid overdose and abuse crisis. … except for expanding the limitations to some highly abused non-opiate medications nothing in the MWAP is outside of the DOH and national recommendations for prudent opiate use.  Regardless, we are coming to the facility to both see the new RMU expansion and have an opportunity to speak with you and the providers…The meeting on Wed is not appropriate for specific patient issues rather a more general discussion regarding the MWAP policy."

270.   Of course, at the meeting Drs. Salvana and Potluri pressed the case for their patients, going through the dossiers they had assembled and explaining the impact on patient health.  Dinello sat with his arms crossed and a scowl on his face through the meeting.

271.   Koenigsmann did nothing for the patients.

272.   In late December Dinello wrote a threatening e-mail to Walsh RMU staff that stated in part, "After reviewing records and talking with nursing/pharmacy staff it appears the MWAP policy is not being followed.  …At the latest census, the RMU has 137 patients with the FHSD [Salvana] seeing 10 patients and the rest seeing 31 patients.  As per policy 1.24 a MWAP Request form needs to be sent for each medication listed.  This needs to then be sent to the RMD for review. Any question regarding the RMD decision needs to be discussed with the reviewing RMD…..In the future…. I will be reviewing adherence to the MWAP 1.24 policy….Consider this an "informal

warning" and that from this point forward a "formal warning" will be issued if the Policy is not followed.

273.   In January of 2018 there was yet another phone conference with Dinello, Koenigsmann, and Salvana.  Once again, Salvana attempted to help the patients in RMUs.  This, too, failed.

274.   Dinello then enlisted the new Deputy Superintendent of Health and Nurse Director to start harassing the non-compliant doctors.

275.   The Nurse Director told her nurses not to assist the doctors with their rounds or with certain tasks related to patient care.

276.   One day Dr. Potluri, a very good and conscientious doctor, walked out of the Walsh RMU not to return.  He was done.

277.   Drs. Smith, Ramineni, and Burdick "retired."

278.   Dr. Salvana was demoted and assigned to a facility four hours round-trip from his home.

279.   When he applied for a position to replace the Facility Health Services Director at Cayuga, a facility near his home, Dinello personally called Dr. Salvana to tell him he was filling the position with a nurse.

280.   As Dr. Salvana could not endure the four-hour daily commute, he "retired."

281.   Dr. Salvana wrote Morley on several occasions regarding the issues with Dinello and MWAP.

282.   In an April 2020 letter Dr. Salvana detailed to Morley Dinello's licensing issues and the utter failure of MWAP, "a policy that has harmed inmates."

283.    As usual, Morley did nothing.  Under oath, he testified that when he learned of Dinello's medical license suspension and revocation, he did not look into it.

284.    Meanwhile, patients in RMUs, many of whom are too sick to communicate or write counsel, continued to suffer.

285.    In February of 2021, as a direct result of class action litigation, DOCCS finally rescinded the MWAP Policy and promulgated a new policy 1.24A "Prescribing for Chronic Pain."

286.    The new policy demanded "Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.  The discussion with the patient and the reasons for discontinuation of the pain medication will be recorded in the AHR."

287.    Of course, in many, many cases this did not happen.  DOCCS never trained the 150+ providers in 44 facilities on the new policy or how or why it was implemented.  Medication discontinuations and denials based on nothing more than the nature of the medication continued.

288.    Providers and nurses continued to tell patients, "we don't give that medication here" when patients transferred in and they continued to discontinue effective medications for non-medical reasons.

289.    Again, DOCCS administrators sat by and watched the constitutional violations.

**Plaintiff's Experience**

290.    James Pine Sr. is 54 years old and currently housed at Clinton Correctional Facility.

291.    When Mr. Pine entered DOCCS custody in 2008, he previously had a hip replacement and used a cane to ambulate.

292.    While housed at Green Haven Correctional Facility, Mr. Pine's doctor, Dr. Lester Silver, ordered many MRIs and x-rays to trace and treat Mr. Pine's continuous medical issues. Documentation of these tests and their outcomes remain in Mr. Pine's medical chart.

293.    On December 31, 2012 Mr. Pine had an MRI of his cervical spine at Putnam Hospital Center.

294.    The MRI showed mild degenerative changes, central disc protrusions at C2-C3, diffuse spondylitis, ridging, and disc protrusion at C3-C4 contributing to mild effacement of the lateral recesses, central disc osteophyte complex indenting, and mild right sided uncovertebral joint osseocartilaginous ridging at C5-C6.

295.    On December 21, 2012, Mr. Pine also had an MRI of his lumbosacral spine.  The MRI showed central disc protrusions and multifactorial mild central canal stenosis at L5-S1 and L4-L5. (005)

296.    On February 20, 2013 Mr. Pine had an MRI of his brain.

297.    The MRI showed a T2 hyperintense lesion projecting over the expected location of the right Petrus, abnormal soft tissue signal within the right mastoid, and abnormal appearance of the Globus pallidus.

298.    The MRI also confirmed that the findings seen on Mr. Pine's prior MRI of the cervical spine were consistent with abnormal signals within the right Petrus Apex, probably representing focal effusion.

299.    On June 17, 2014 Mr. Pine had an x-ray done of his spine and hip.

300.    The X-ray showed degenerative lower lumbar disc disease L5-S1, mild degenerative lumbar spondylosis, and mild lumbar levoscolios.

301.    On September 1, 2014, Dr. Silver prescribed Gabapentin to treat Mr. Pine's

ongoing chronic pain conditions. Mr. Pine's chronic pain was generally effectively treated for the next few years.

302.    On May 15, 2017 Dr. Lester Silver referred Mr. Pine for an MRI of his right shoulder.

303.    The MRI showed impingent syndrome, supraspinatus, tendinopathy, mild hypertrophic degenerative osteoarthritic changes, and fluid in the AC joint.

304.    On May 8, 2017 Dr. Silver put in an MWAP request form to renew Mr. Pine's prescription for gabapentin which was treating Mr. Pine's chronic pain. On the request form, Dr. Silver detailed Mr. Pine's chronic pain in his hip, leg and shoulder and indicated radiology testing from December 2016 to prove the conditions. And listed that Mr. Pine had been on gabapentin since September 1, 2014.

305.    Dr. Hammer approved the request but only for a 30 days to effectuate a taper and discontinuation.   Without examining Mr. Pine or reviewing his records Hammer stated, "neurontin should be reserved for cases of neuropathic pain. Hopefully you will be able to meet with this patient and have a discussion explaining the rationale for tapering this medication off over 30 days."

306.    Again in June of 2017, Dr. Silver submitted an MWAP request form for gabapentin for Mr. Pine. On the form Dr. Silver explained that Mr. Pine suffers from chronic right leg and foot pain with EMG documented polyneuropathy.

307.    Dr. Silver also explained that he "would appreciate more than one month approval, as his condition is not likely to improve. Optimally, I would like to increase his dose to a therapeutic dose of 1800-2400 mg daily."

308.    Dr. Hammer approved a 600 mg dose, based solely on Dr. Silver's "discretion

and assume you are convinced of the drugs efficacy in this case." Further Dr. Hammer warned Dr. Silver to "be cautious about any increase, it is usually a continuous upward spiral."

309.     Despite Dr. Hammer's reliance on Dr. Silver's discretion he renewed the medication for 6 refills only despite Dr. Silver's request for 11.

310.     In August of 2017 Dr. Silver again put in an MWAP request form for Mr. Pine, requesting gabapentin, and detailing the same documented conditions.

311.     Dr. Hammer approved the gabapentin for 300 mg and again suggested dangers of increased doses leading to a "never ending upward spiral until the maximum dose is arrived at" and strongly discouraged any increases in dosage.

312.     In December of 2017, Dr. Silver put in another MWAP request form for gabapentin for Mr. Pine, requesting a dose increase to 1200 mg based on the recommendation of the physiatrist.

313.     In response to Dr. Silver's professional medical opinion that Mr. Pine needed an increased dose, Dr. Hammer instead denied the administration of the medication beyond a 30 day tapering period. In his denial Dr. Hammer decried the predicted upward spiral of increased dosages and suggested "alternatively that we acknowledge a lack of efficacy of the drug and opt for an alternative medication."

314.     Again Dr. Silver put in an MWAP request form attempting to get gabapentin for Mr. Pine to provide some relief from his chronic pain and documented medical conditions.

315.     Dr. Hammer again denied the request and suggested that Dr. Silver "please select a safer, alternate medication without the habit forming, abuse/diversion potential of neurontin."

316.     Mr. Pine's Gabapentin was tapered and he began to suffer from chronic pain and neuropathy.

317.    Dr. Silver did not prescribe an effective alternative despite knowing that Mr. Pine was suffering without his effective medication.

318.    On August 16, 2018 Mr. Pine had another MRI of his brain.

319.    The MRI showed a few stable arachnoid granulation cysts within the occipital bones of the posterior fossa, subcortical white matter signal change that may represent demyelination atypical vasculitices and suspected right sided mastoiditis.

320.    On October 9, 2018 Dr. Silver referred Mr. Pine for a specialty consult with neurology.

321.    On October 31, 2018 Mr. Pine had an appointment with neurology, where Dr. Ranade  recommended he come back again soon to follow up.

322.    On November 1, 2018 Dr. Silver again referred Mr. Pine for a specialty consult with neurology, to follow up for the "non-specific white matter abnormalities on MRI of brain, likely benign essential tremor, on no medications at this time."

323.    Thus, despite Mr. Pine's ongoing medical problems and continuous pain, as Dr. Silver highlighted, Mr. Pine was not then on any prescriptions to treat those conditions other than Zoloft to help with his tremors.

324.    On March 11, 2019 Dr. Silver referred Mr. Pine to orthopedics to address a possible right rotator cuff tear.

325.    At the orthopedics appointment, on April 11, 2019, the orthopedist, Dr. Holder, recommended an MRI to better evaluate Mr. Pine's shoulder.

326.    On September 5, 2019 Mr. Pine had an MRI of his right shoulder.

327.    The MRI showed moderate grade partial thickness articular-sided tear of supraspinatus, partial supraspinatus tear, and mild subacromial subdeltoid bursitis.

328.    On July 9, 2020, Mr. Pine had another orthopedics appointment with Dr. Holder where he said Mr. Pine needed to be scheduled for a right shoulder arthroscopy.

329.    On June 15, 2021, Dr. Holder performed an arthroscopy of Mr. Pine's right shoulder to fix the anterior slap tear of his rotator cuff.

330.    Mr. Pine then attended physical therapy for 8 weeks.

331.    In February of 2021 due to the Allen class action litigation DOCCS had to rescind the MWAP Policy and finally allowed providers to reassess patients and put them back on MWAP medications.

332.    In October of 2021, after around 5 years without, Dr. Lester successfully renewed Mr. Pine's prescription for gabapentin. Mr. Pine finally had some relief from his chronic pain and neuropathy.

333.    In July 2022, DOCCS transferred Mr. Pine to Great Meadow Correctional Facility. At the time of his transfer, Mr. Pine was taking gabapentin.

334.    At Great Meadow, Dr. Howard Silverberg acted as Mr. Pine's provider and immediately discontinued Mr. Pine's Gabapentin prescription without even examining him.

335.    When Mr. Pine finally met with Dr. Silverberg, the Doctor mentioned his slight hypertension and Mr. Pine requested that his effective treatment with Gabapentin be reinstated. Dr. Silverberg threw Mr. Pine out of his office and refused to treat him.

336.    Mr. Pine submitted several sick call slips regarding his increased pain and suffering.

337.    In December of 2022, DOCCS again transferred Mr. Pine, this time to Clinton Correctional Facility.

338.    When DOCCS transferred Mr. Pine to Clinton, he immediately raised the issue

of his Gabapentin prescription with medical staff.

339.    On January 18, 2023, he finally got an appointment with medical and Mr. Pine requested he be represcribed his effective pain medication, gabapentin.

340.    Class counsel in *Allen* had to intercede and wrote an advocacy letter including Mr. Pine's medical records.

341.    On January 31, 2023 Nurse Practitioner Susan Devlin-Varin finally represcribed Gabapentin for Mr. Pine.  Mr. Pine had gone five months without effective treatment due to Dr. Silverberg's refusal to prescribe an MWAP medication.

342.    On March 8, 2023, DOCCS put Mr. Pine on the Medication Assisted Treatment program to help alleviate some of his residual pain and discomfort.

343.    On March 30, 2023, NP Devlin-Varin prescribed 8 mg of suboxone for Mr. Pine.

344.    On April 25, 2023, NP Devlin-Varin increased Mr. Pine's gabapentin prescription and renewed his suboxone prescription, noting his neuropathy has been confirmed by a past EMG.

345.    On June 29, 2023, NP Devlin-Varin noted during a visit to follow up on "MAT/ Pain management" that the sublocade was working along with the neurontin to treat Mr. Pine's pain.

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983**
***Deliberate Indifference***
***(Against Defendants Hammer, Silver and Silverberg in their individual capacities)***

346.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

347. In approximately 2015, Dinello, Mueller, Bozer, Hammer and other members of

DOCCS medical administration determined to remove certain medications from DOCCS' facilities – not based on patients' needs or efficacy – but the perceived "abuse potential" of the medication.

348.    DOCCS' Central Office started marking each facility's ability to get their patients off the medications.  Discontinuations were done without medical justification or individualized assessments.

349.    Mr. Pine was a victim of this grand plan.  In 2017 when these specious customs and practices of discontinuing effective medications without medical justification were folded into the MWAP Policy, Mr. Pine's effective medication was discontinued.

350.    Despite having his medical records for review, Defendant MDs and Mid-Level clinicians continuously refused to represcribe Mr. Pine's effective treatment due to these policies and customs.  Mr. Pine repeatedly and consistently reported his pain and suffering to no avail.

351.    Mr. Pine suffered severely for over four years due to Defendants' adherence to the customs, policies and practices described above.

## **PRAYERS FOR RELIEF**

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendant DOCCS' physicians and administrators in their individual capacities:

A.    Awarding Plaintiff compensatory damages for pain and suffering, including compensation for garden variety emotional damages;

B.    Awarding Plaintiff's reasonable attorneys' fees, costs, disbursements, and other litigation expenses, pursuant to 42 U.S.C. § 1988;

C.    Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
     August 13, 2023

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By:  */s/ AJ Agnew*
Amy Jane Agnew, Esq.
Joshua L. Morrison, Esq.
*Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com

# EXHIBIT 1

DOCCS PROVIDER

DOCCS Provider allegedly violates patient's rights

PATIENT/PLAINTIFF

Patient writes letters seeking help from outside agencies/people

Letters to Commission of Correction

Letters to Politicians

Letters to Department of Health

Letters to Office of Professional Misconduct

Outside agencies forward letters to CMO or direct patient to write CMO

Regional Health Services Administrators Answer All Letters for CMO Same Way

CMO reads and forwards all complaints to RHSA to answer

Patient writes CMO directly

CHIEF MEDICAL OFFICER

RHSA LETTER BACK TO PATIENT "use existing sick call procedures"

Patient files grievance and exhausts

INMATE GRIEVANCE PROGRAM CORC Responses take at least a year and all end "address any medical concerns to medical staff via sick call procedures"

DEAD END
no relief for patient