UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES PINE,<br><br>Plaintiff,<br><br>-against-<br><br>LESTER SILVER, et al.,<br><br>Defendants. | <u>OPINION AND ORDER</u><br><br>No. 23-CV-7148 (LAP) |
| KENNETH WINDLEY,<br><br>Plaintiff,<br><br>-against-<br><br>KYOUNG KIM, et al.,<br><br>Defendants. | No. 23-CV-7151 (LAP) |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are two motions for summary judgment filed by Defendants in two related cases. Individual Plaintiffs have opposed each motion for summary judgment. For the reasons set forth below, in <u>Pine v. Silver, et al.</u>, S.D.N.Y. 23-CV-7148, summary judgment is GRANTED for Dr. Lester Silver and DENIED for Dr. Howard Silverberg. In <u>Windley v. Kim, et al.</u>, S.D.N.Y. 23-CV-7151, Dr. Kyoung Kim's motion for summary judgment (dkt. no. 109) is GRANTED.

The Court incorporates the Background and Legal Standard sections of its prior decisions in this class action, as set forth

in Allah v. Dinello, No. 23-CV-3286 (LAP), 2026 WL 879107, at *1 (S.D.N.Y. Mar. 31, 2026), as follows:

## I. **Background**

The Court assumes familiarity with its decision in related case Allen v. Mueller, No. 23-CV-5651, 2024 WL 3090141 (S.D.N.Y. June 21, 2024). A streamlined version of the relevant facts and procedural history follows.

The above-captioned case arises from a class action brought by several named New York State Department of Corrections and Community Supervision ("DOCCS") inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the Medications With Abuse Potential ("MWAP") Policy. See Allen v. Koenigsmann, No. 19-CV-8173 (LAP), 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023); Allah v. Dinello, No. 23-CV-3286 (LAP), 2026 WL 879107, at *1 (S.D.N.Y. Mar. 31, 2026).[1]

DOCCS adopted the MWAP Policy in June 2017. Allah, 2026 WL 879107 at *1. The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS Regional Medical Director ("RMD") in charge of the medical provider's facility. See id. Before the DOCCS medical provider had authority to prescribe the requested

[1] The Court will refer to the class action, 19-CV-8173, as "**Allen I**."

medication for long-term use for chronic conditions, the RMD had to approve the MWAP Request. See id.

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates. See id. Medications that required RMD approval under the MWAP Policy included Gabapentin (Neurontin), Lyrica (Pregabalin), Baclofen, Flexeril (Cyclobenzaprine), Ultram (Tramadol), Percocet, and Oxycodone. See id. DOCCS rescinded the MWAP Policy on February 8, 2021. See id.

Plaintiffs in the class action asserted claims under 42 U.S.C. § 1983 alleging deliberate indifference to their medical needs due to DOCCS implementation of the MWAP Policy and the discontinuation and denial of their medications that ensued. See id. at *2. Plaintiffs moved for class certification and for a preliminary injunction seeking relief from the ongoing effects of the MWAP Policy, arguing that DOCCS was continuing to deny effective treatment to patients who had lost their medications due to the MWAP Policy. See id.

On March 31, 2023, this Court issued an Opinion granting the Allen I plaintiffs' motion to certify a class to pursue injunctive relief but denying the Plaintiffs' motion to certify a class to pursue damages for liability. See Allen I, 2023 WL 2731733, at *6. The Court held that plaintiffs in Allen I had failed to show that

the proposed "liability class" had standing to sue under Article III of the United States Constitution. See id. at *2-3.

Also on March 31, 2023, the Court granted the Allen I plaintiffs' motion for a preliminary injunction, determining plaintiffs had demonstrated ongoing constitutional violations, including medically unjustified discontinuations of MWAP treatment and a likelihood of imminent future harm across the class. Allen I, 19-CV-8173, 2023 WL 2752375, at *22-23 (S.D.N.Y. Mar. 31, 2023).

After a four-day bench trial, this Court converted the preliminary injunction into a permanent injunction, concluding that remedying the constitutional violations in DOCCS' pain management practices outweighed the administrative challenges DOCCS would face in implementing a permanent injunction. Allen I, 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023). The Court then awarded attorneys' fees to Plaintiffs' counsel. See Allah, 2026 WL 879107 at *2.

The Court of Appeals affirmed this Court's decision to grant a permanent injunction and award Plaintiffs' counsel attorneys' fees. See Daniels et al. v. Moores, No. 24-30-pr, 2025 WL 883035, at *1 (2d Cir. Mar. 21, 2025) (summary order). The Court of Appeals credited the Court's determination that "the MWAP Policy was still de facto in place, despite being formally rescinded, because prisoners in DOCCS custody continued to have their MWAP medications systematically denied without medical justification

and without regard to medical need." Id. at *2. In addition, the Court of Appeals found no error in the Court's conclusion that Plaintiffs suffered Eighth Amendment violations and therefore irreparable harm. Id. at *2-3. In so holding, the Court of Appeals reiterated that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians" and where defendants "reflexively rel[ied] on . . . the substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe [the medication] to the plaintiff." Id. at *3 (citing Johnson v. Wright, 412 F.3d 398, 404, 406 (2d Cir. 2005)).

Following this Court's denial of certification of a "liability class," various plaintiffs filed individual suits for damages against various DOCCS employees, including RMDs, physicians, physician assistants, and nurse practitioners ("NPs"). See Allah, 2026 WL 879107 at *2.

Similar to the allegations made in the class action, these plaintiffs each alleged violations of 42 U.S.C. § 1983 based on deliberate indifference to their medical needs. See Allah, 2026 WL 879107 at *2.

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'It is the movant's burden to show that no genuine factual dispute exists.'" I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y., 746 F.3d 538, 544 (2d Cir. 2014) (quoting Liberty Lobby, Inc., 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)). In ruling on a

motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)). The non-moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

**B. Eighth Amendment**

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual

punishments" on those in their care. U.S. Const. amend. VIII. Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from acting with "deliberate indifference to serious medical needs of prisoners[.]" Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), abrogated in part on other grounds by Kravitz v. Purcell, 87 F.4th 111 (2d Cir. 2023). The first requirement the plaintiff must meet "is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The second requirement "is subjective: the charged official must act with a sufficiently culpable state of mind." Id. at 280. Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Estelle, 429 U.S. at 104).

Satisfying the objective prong entails two inquires. First, the Court must assess "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279. The second part of the objective inquiry asks whether the deprivation

or inadequacy of the plaintiff's medical care is "sufficiently serious." Id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific" which requires "tailor[ing] [it] to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted). This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate. See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious." Id. at 280 (emphasis added). Certain factors courts consider when evaluating the seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. Instead of determining

the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith 316 F.3d at 185). Such inquiry requires the Court to examine "the particular risk of harm" the plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges. Id. at 186-87 (emphasis added).

To satisfy the subjective prong, i.e., to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)(quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This standard is akin to a mental state of subjective recklessness, as used in criminal law. See Salahuddin, 467 F.3d at 280. The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving

"that the risk was obvious or otherwise must have been known to [the] defendant[.]" Brock, 315 F.3d at 164.

### C. Personal Involvement

Plaintiffs assert their Eighth Amendment claims pursuant to 42 U.S.C. § 1983. To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Thus, to establish a particular defendant's liability, a plaintiff must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that each particular defendant "knew of and disregarded an excessive risk to [Plaintiffs'] health or safety." Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred[.]" Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

**D. Qualified Immunity**

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to 'discretionary functions' performed in their official capacities." Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Whether a government official can invoke qualified immunity "turns on the 'objective legal reasonableness' of the official's acts." Id. at 151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The reasonableness of the official's actions "must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Id. at 124 (quoting Creighton, 483 U.S. at 639).

To determine whether the official violated rights that were "clearly established," the Court "must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." Id. at 151-52 (internal quotations and citations omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." Id. at 152. As the Supreme Court phrased differently in a previous case, the "right must be sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right."

Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations and citations omitted).

When confronted with the qualified immunity defense, the Court must determine the scope of the right that the plaintiff asserts was clearly established and that the official violated that right. There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations and citations omitted). In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established. Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)). As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of pain[.]" Collymore v. Myers, 74 F.4th 22, 30 (2d Cir. 2023). Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation. See LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998).

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of particular conduct is clearly established[.]" Vega v. Semple, 963 F.3d 259, 275 (2d Cir. 2020). (emphasis in original) (internal quotations and citations omitted). Accordingly, the Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." Id. In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'" Collymore, 74 F.4th at 30 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

## III. Discussion[2]

The Court will evaluate the summary judgment motions pending in two Allen I Individual Plaintiff actions for deliberate indifference.

### A. Plaintiff James Pine's Claim: S.D.N.Y. 23-cv-7148

In this matter, Defendants, Dr. Lester Silver and Dr. Howard Silverberg, move for summary judgment. (Dkt. nos. 92 (Mot.), 98 (MOL).) Plaintiff, James Pine, opposes the motion. (Dkt. no. 115 (Opp.).) Defendants have replied. (Dkt. no. 120 (Reply).)

[2] Citations to page numbers in the records refer to Bates numbering. Citation to page numbers in the parties' briefs refer to the parties' original pagination.

James Pine was incarcerated at Green Haven Correctional Facility ("Green Haven") from approximately 2011 through 2022. (Pine SUF [dkt. no. 111] ¶ 1 (undisputed).) He suffers from chronic pain in his right hip and leg stemming from a 2009 total hip replacement and two subsequent hip revisions. (Silver Decl. [dkt. no. 93] ¶ 18.) An EMG performed in 2012 documented nerve damage in his right leg. (Silver Decl. ¶ 21.)

Dr. Lester Silver was employed by DOCCS at Green Haven from 1994 through 2022 and served as Mr. Pine's healthcare provider from approximately September 2014, when Mr. Pine's Gabapentin prescription began, through Dr. Silver's retirement in February 2022. (Silver Decl. ¶¶ 2, 18, 42.)

Dr. Howard Silverberg began his employment with DOCCS in 2002, working at Great Meadow Correctional Facility from 2002 until late 2024. (Silverberg Decl. [dkt. no. 94] ¶ 2.)

**Dr. Silver's Treatment (Green Haven, 2014-2022).** In June 2017, DOCCS instituted the MWAP Policy, which required RMD approval before a physician could prescribe certain medications, including Gabapentin, and which, absent approval, left the treating physician unable to refill or continue the medication for chronic use. (Silver Decl. ¶¶ 15-16.)

In June 2017, Dr. Silver submitted an MWAP request, seeking eleven refills of Mr. Pine's Gabapentin 600 mg nightly, describing Mr. Pine's hip replacement, hip and leg pain, and shoulder

impingement, and noting that Mr. Pine had been taking Gabapentin since September 2014. (Silver Decl. ¶ 18.) RMD Dr. Hammer approved the request but limited it to 30 days as Dr. Hammer generally refused to approve Gabapentin for more than 30 days at that time. (Pine SUF ¶ 5 (undisputed); Silver Decl. ¶ 18.)

When Dr. Silver next saw Mr. Pine in July 2017, he learned the medication had lapsed because he had not been notified of the need to renew it, and he submitted a renewal request. (Silver Decl. ¶ 19.) That same day, Dr. Silver also requested a physiatry consult. Dr. Hammer approved the MWAP request for six refills, cautioning against dosage increases. (Silver Decl. ¶¶ 20-21.)

In August 2017, Mr. Pine saw the physiatrist, who recommended an increased dose. (Pine SUF ¶ 6 (undisputed); Silver Decl. ¶ 22.) Anticipating Dr. Hammer would not approve the full 600 mg recommended by the physiatrist, Dr. Silver instead requested 300 mg TID in August 2017. Dr. Hammer approved it for six refills, again cautioning against increases. (Silver Decl. ¶ 23.) Although Mr. Pine's Gabapentin was not up for renewal until the end of March 2018, Dr. Silver submitted a December 2017, MWAP request seeking the physiatrist-recommended increase to 1200 mg, which Dr. Hammer denied. (Pine SUF ¶ 7 (undisputed); Silver Decl. ¶¶ 24-25.)

In March 2018, Dr. Silver submitted another MWAP request for 600 mg TID. Dr. Hammer denied it, directing Dr. Silver to "select a safer, alternate medication." (Pine SUF ¶ 8 (undisputed as to

the refusal); Silver Decl. ¶ 26.) Dr. Silver declared that his understanding was that there were no other options after a non-approval but to follow the RMD's recommendation.[3] (Silver Decl. ¶ 16.) Mr. Pine's Gabapentin was tapered over the following twenty days and then discontinued. (Silver Decl. ¶ 27.)

At a June 2018 visit, Dr. Silver noted increased right hip pain since the Gabapentin discontinuation, along with a history of decreased sensation and Parkinson's disease that Mr. Pine reported. (Silver Decl. ¶ 28.) Dr. Silver declared, "I made a number of referrals for Mr. Pine including an MRI of his brain (as workup for Parkinson's concerns) and an optometry consult." (Silver Decl. ¶ 28.) Dr. Silver also prescribed Nabumetone 500mg, an NSAID, which he states he believed a reasonable alternative given his inability to prescribe Gabapentin. (Silver Decl. ¶ 28.)

In October 2018, Dr. Silver discussed the brain MRI results with Mr. Pine, which showed white matter demyelination, and referred him to neurology and to a physiatrist for his shoulder. (Silver Decl. ¶ 29.) Later that month, the neurologist found no evidence of Parkinson's disease, concluding a benign essential

---

[3] Indeed, the June 2017 MWAP Policy —— the policy in effect in March 2018 —— does not contemplate an appeal of an RMD's denial. (June 2017 MWAP Policy 1.24 [Agnew Decl. [dkt. no. 110-5] Ex. 5] § IV.A.); see also (September 2018 MWAP Policy 1.24 [Agnew Decl. [dkt. no. 110-97] Ex. 38] § IV.A. (superseding June 2017 MWAP policy and contemplating MWAP approval by "RMD, or DC/CMO as appropriate".)

tremor was more likely, and recommended no additional treatment beyond a three-month follow-up. (Silver Decl. ¶ 30.)

At a January 2019 neurology follow-up for the brain MRI referral, the provider's note recorded, "pt put on Zoloft — he feels it is helping tremor," and stated the plan was to try Inderal if Zoloft proved ineffective. (Silver Decl. Exh. A, Pt. 2 [dkt. no. 93-2] at 57.) The note contains no reference to hip pain, Gabapentin, or any pain complaint. (Id.)

In March 2019, Dr. Silver referred Mr. Pine to an orthopedic consult for ongoing shoulder pain, noting several prior courses of physical therapy without benefit and requesting evaluation for possible surgery. (Silver Decl. ¶ 32; Pine SUF ¶ 15 (undisputed).) The Orthopedic surgeon evaluated Mr. Pine in April 2019, administered a steroid injection, and requested an MRI to evaluate for a rotator cuff tear. (Silver Decl. ¶ 33.) The MRI, performed in September 2019, revealed a low-grade partial-thickness tear of the supraspinatus but no full-thickness tear. (Silver Decl. ¶ 34; Pine SUF ¶ 17 (undisputed).)

In January 2020, Dr. Silver noted continuing shoulder pain, that NSAIDs were disrupting Mr. Pine's sleep, and referred him back to the surgeon. (Silver Decl. ¶ 35.) The surgeon recommended shoulder arthroplasty and related procedures in July 2020, but the RMD denied the surgery request. (Silver Decl. ¶ 37; Pine SUF ¶ 18 (undisputed).) Dr. Silver noted that he would resubmit the request

in November 2020 after having been deferred due to Covid-related concerns. (Silver Decl. ¶ 38.)

DOCCS rescinded the MWAP Policy in February 2021. In June 2021, during a pre-operative exam for upcoming shoulder surgery, Dr. Silver noted Mr. Pine's complaints of ongoing right-sided neuropathic pain for which he had previously taken Gabapentin. (Silver Decl. ¶ 39.) Mr. Pine underwent shoulder surgery in June 2021 and received Percocet for post-operative pain. (Silver Decl. ¶ 40.) In July 2021, Dr. Silver restarted Mr. Pine on Gabapentin via a titration schedule. (Silver Decl. ¶ 41; Pine SUF ¶ 19 (undisputed as to the re-prescription).) Dr. Silver retired from DOCCS in February 2022, and Mr. Pine still had an active Neurontin prescription at that time. (Silver Decl. ¶ 42; Pine SUF ¶ 20 (undisputed).) Mr. Pine testified that although he believed Dr. Silver "should have fought a little more" to get his Gabapentin, Dr. Silver "would try to give [him] everything that [he] needed" but that his "hands were tied" and that Dr. Silver did not do anything else to get him treated. (Manley Decl. Exh. B [Pine Tr.] [dkt. no. 96-2], 84:23-85:22; 86:2-88:9; 131:22-132:4)

**Dr. Silverberg's Treatment (Great Meadow, 2022).** Mr. Pine was transferred to Great Meadow Correctional Facility on July 15, 2022, and was evaluated by nursing staff on arrival. (Pine SUF ¶ 21 (undisputed); Silverberg Decl. ¶ 10.) On July 19, 2022, Dr. Silverberg noted that prescriptions for Mr. Pine's self-carry

medications were written and requested that Mr. Pine's chart be located. (Silverberg Decl. ¶ 10.) Mr. Pine did not receive Gabapentin upon arrival at Great Meadow. (Pine SUF ¶ 22 (undisputed).) On July 26, 2022, Dr. Silverberg: reviewed Mr. Pine's chart, signed off on his intake screening form, placed orders for a follow-up primary care appointment as well as for routine labs and an EKG, and issued a permit regarding the implanted hardware in Mr. Pine's hip. (Silverberg Decl. ¶ 11.) While Dr. Silverberg had previously reviewed Mr. Pine's charts, as just discussed, Dr. Silverberg's first, and only, appointment with Mr. Pine took place in November 2022. (Pine SUF ¶ 23 (disputed as to relevance); Silverberg Decl. ¶ 12.)

At the November 2022 appointment, Mr. Pine reported he had "just rushed in from the yard." (Silverberg Decl. ¶ 12.) Dr. Silverberg assessed Mr. Pine's hypertension, noted his compliance with his blood pressure medications, and ordered hydrochlorothiazide further to treat his high blood pressure; he entered referrals for labs, blood pressure checks, and a follow-up appointment. (Silverberg Decl. ¶ 12.) It is undisputed that Dr. Silverberg never wrote Mr. Pine a new Gabapentin prescription during his time at Great Meadow, notwithstanding his review of Mr. Pine's chart on July 26, 2022. (Silverberg Decl. ¶¶ 11, 14; Pine SUF ¶¶ 22-24; Agnew Decl. Ex. 32-7 [dkt. no. 110-79] at 318-23.)

However, the parties dispute what occurred regarding Gabapentin at that November 2022 appointment. Dr. Silverberg declared that he never refused to treat Mr. Pine, never "thr[ew] him out of [his] office," and would have recorded it in the chart if Mr. Pine had inquired about a prescription for Neurontin. (Silverberg Decl. ¶ 14.) Dr. Silverberg also declared that Mr. Pine made no complaints of pain at the appointment. (Silverberg Decl. ¶ 12.)

Mr. Pine testified, by contrast, that he asked Dr. Silverberg about the Gabapentin he had been receiving at Green Haven, that Dr. Silverberg responded, "you're not here for that," and that when Mr. Pine asked him to look at his file, Dr. Silverberg "threw [him] out of his office," saying "get out." (Pine Tr. 112:2-17.)

The medical record presented to the Court from Mr. Pine's time at Great Meadow contains no mention of, or request for, Gabapentin. (Pine SUF ¶ 27 (disputed, but undisputed that record contains no documents request at that time); Silverberg Decl. ¶ 14.) Although, Mr. Pine testified that during this period, he submitted sick call slips requesting the medications he had previously received. (Pine Tr. 112:23-113:6.) Mr. Pine filed no grievances against Dr. Silverberg while at Great Meadow. (Pine SUF ¶ 28 (undisputed).) Dr. Silverberg had no further contact with Mr. Pine, who transferred out of Great Meadow in mid-December 2022. (Agnew Decl. Ex. 32-7 [dkt. no. 110-79] at 345; Silverberg Decl. ¶ 13.)

**Dr. Silver: Granted.** Plaintiff argues that Dr. Silver "chose an easier and less efficacious treatment rather than working with Mr. Pine" after his Gabapentin was discontinued, pointing to an August 2017 email in which Dr. Hammer invited Dr. Silver to resubmit with a revised dosing schedule. (Opp. [ECF 115] at 63.)

As Defendants note on reply, this conflates that email, to which Dr. Silver responded within two days by submitting a revised request Dr. Hammer promptly approved (Silver Decl. [dkt. no. 93] ¶ 23; Silver Decl. Ex. B [dkt. no. 93-5] at 10-13), with the Nabumetone substitution that followed Gabapentin's final discontinuation seven months later. (Silver Decl. ¶ 28; Pine SUF ¶ 8 (undisputed as to the refusal.)

Plaintiff identifies no ignored specialist recommendation, no contradicted chart entry, and no expert opinion placing Dr. Silver's course of treatment, five MWAP submissions, followed by a continuous sequence of alternative treatment and referrals through 2021, in genuine dispute.

Plaintiff's own dissatisfaction that Dr. Silver "couldn't do anything" or "should have fought a little more" (Pine Tr. 84:23-85:22, 86:2-88:9, 132:3-4) is conclusory and insufficient to defeat summary judgment. See In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (citation omitted). Pine himself testified that his feeling was speculative and that he did not know. (Pine Tr. 85:22-25 ("He seemed to roll

over a little bit, maybe, you know, I don't -- I don't know. I could speculate on why, but he just -- I don't -- I don't know.") Indeed, this sentiment does not "create more than a metaphysical possibility" of a triable claim. Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quotation marks and citation omitted).

Accordingly, Dr. Silver's motion for summary judgment in 23-cv-7148 is GRANTED.

**Dr. Silverberg: Denied.** Defendants argue that Plaintiff's claim against Dr. Silverberg must be dismissed for failure to exhaust, as it is undisputed Plaintiff filed no grievance concerning his care at Great Meadow. (MOL at 5-6; Pine SUF ¶ 28 (undisputed).) The PLRA requires exhaustion only of "available" remedies and an inmate "need not exhaust unavailable ones." Ross v. Blake, 578 U.S. 632, 642 (2016). An administrative procedure is unavailable, for instance, where it "operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 643. And under Ross and its progeny, whether a remedy was available turns on "the facts on the ground" and "the real-world workings" of the particular grievance system at issue. Id.

This Court has already found, in the related Allen I litigation, that prison officials were in certain instances "unable or unwilling to provide any relief" to inmates grieving their MWAP-related medication denials. Daniels v. Mueller, 2025

WL 949842, at *28 (S.D.N.Y. Mar. 28, 2025). And, even after MWAP Policy was formally rescinded, this Court found that some patients continued to have effective medications denied or discontinued consistent with the MWAP Policy's practice, because "not all facilities or providers [] updated their customs and practices following the repeal of the MWAP Policy." Allen v. Koenigsmann, 700 F. Supp. 3d 110, 144 (S.D.N.Y. 2023). Given this record, whether the grievance process at Great Meadow was, in practice, capable of providing Plaintiff any relief for his 2022 complaint against Dr. Silverberg is too fact-intensive a question to resolve on summary judgment. Rather, this question can be presented to the jury. Accordingly, the Court denies this requested relief without prejudice and proceeds to the merits.

Dr. Silverberg's involvement with Mr. Pine was brief. He reviewed Mr. Pine's chart and handled routine intake matters in July 2022, and saw him once, in November 2022, for a visit centered on hypertension. (Silverberg Decl. ¶¶ 11-12.) It is undisputed that Dr. Silverberg never issued Mr. Pine a new Gabapentin prescription during his time at Great Meadow. (Silverberg Decl. ¶¶ 11, 14.) Defendants argue that this limited involvement, without more, cannot support a finding of deliberate indifference. (MOL at 13-15.)

However, Mr. Pine testified that at the November 2022 appointment he asked Dr. Silverberg about the Gabapentin he had

been receiving at Green Haven, that Dr. Silverberg told him "you're not here for that," and that when he asked Dr. Silverberg to look at his file, Dr. Silverberg "threw [him] out of his office," saying "get out." (Pine Tr. 112:2-17.) Dr. Silverberg, for his part, declared that he "never refused to treat Mr. Pine," never "thr[ew] him out of [his] office," and would have documented any inquiry about Neurontin had one been made. (Silverberg Decl. ¶ 14.)

Whether Dr. Silverberg refused Mr. Pine's request and ejected him from the office, or whether no such request or removal ever occurred, is a question of credibility that the Court cannot resolve on this record, and must be left to the jury. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Finally, because there are disputed facts material to the reasonableness of Dr. Silverberg's conduct, the Court cannot find that he is entitled to summary judgment on the basis of qualified immunity. See Daniels, 2025 WL 949842, at *27.

Accordingly, Dr. Silverberg's motion for summary judgment in 23-cv-7148 is **DENIED.**

### B. Plaintiff Kenneth Windley's Claim: S.D.N.Y. 23-cv-7151

In this matter, Dr. Kyoung Kim[4] moves for summary judgment. (S.D.N.Y. 23-cv-7151, dkt. nos. 109 [Mot.], 115 [MOL].) Plaintiff

[4] Plaintiff's papers at times refer to a "Defendant Lee." (See, e.g., Windley SUF [ECF 128] ¶¶ 26, 30, 74-75; Opp. at 50-54.) The chart entries and deposition testimony on which Plaintiff relies *(fn. cont. next page)*

Kenneth Windley opposes the motion. (23-cv-7151, dkt. no. 132 [Opp.].) Dr. Kim has replied. (23-cv-7151, dkt. no. 138 [Reply].) The motion was also made on behalf of NP Dahlia Wiggan, whom Plaintiff has since voluntarily dismissed with prejudice. (23-cv-7151, dkt. nos. 131, 133.) Plaintiff earlier dismissed Defendants John Hammer and Janice Wolf by stipulation. (23-cv-7151, dkt. no. 94.) Defendants Veronica Ruiz, Genevieve Switz, and Ashley Baker-Harris, whom Plaintiff describes as his providers at Woodbourne Correctional Facility, have not moved. (Opp. at 49 n.9, 54.)

Mr. Windley was housed at Green Haven from 2007 to 2021. (Windley SUF [dkt. no. 128] ¶ 3 (undisputed).) Dr. Kim, a physician at Green Haven since 2016, was one of his care providers from 2017 until Mr. Windley left. (Windley SUF ¶ 4 (undisputed).)

Dr. Kim's involvement began in May 2017, when Mr. Windley was receiving Neurontin, 900 mg three times daily, for lower back pain and numbness in both feet. (Windley SUF ¶¶ 5-6 (undisputed).) Dr. Kim assessed him for a colonoscopy, noted his back history and a December 2016 MRI showing degenerative changes, and referred him to an orthopedic surgeon. (Windley SUF ¶¶ 7-10 (undisputed).)

---

*(cont.)* concern Dr. Kim, and there is no "Defendant Lee" in this case. Accordingly, the Court reads those references as referring to Dr. Kim.

The orthopedic surgeon saw Mr. Windley in June 2017. (Windley SUF ¶ 11 (undisputed).) The surgeon noted that Windley was taking Neurontin and had numbness in both of his feet and an MRI showing herniated discs at L1-L2, L2-L3, and L5-S1, and Dr. Galeno recommended surgery consisting of a laminectomy, disc excision, hardware removal, and refusion from T10 to S1. (Windley SUF ¶¶ 12-13 (undisputed as to these findings).)

In September 2017, Dr. Kim noted that the surgery had not been approved. (Windley SUF ¶ 15 (undisputed).) Dr. Kim submitted an MWAP request to continue Mr. Windley on Neurontin, and RMD Hammer approved it for a year, with eleven refills. (Windley SUF ¶ 14 (undisputed); Kim Decl., Ex. B [dkt. no. 110-2] at 1.) Mr. Windley remained on the same dose through May 2018. (Windley SUF ¶ 16 (undisputed).)

In June 2018, Dr. Kim submitted another MWAP renewal request. (Kim Decl., Ex. B [dkt. no. 110-2] at 3.) RMD Hammer denied it, stating that Lyrica had not been shown effective for radiculopathy, that Neurontin is not FDA-approved for that indication, and that alternative medications lacked Neurontin's abuse/diversion potential. (Id. at 4.) Thereafter, Dr. Kim "noted that Mr. Windley would be tapered off his Gabapentin and that another medication, Cymbalta, would be tried for Mr. Windley's pain." (Kim Decl. [dkt. no. 110] ¶ 19.) Dr. Kim declared that, without RMD approval, he could not prescribe Neurontin, and that he understood

the MWAP Policy to have no appeal mechanism. (Kim Decl. ¶ 12.) In September 2018, after the June 2018 denial, the MWAP policy was amended permitting Chief Medical Officer review of MWAP requests. (Agnew Decl., Ex. 38 [dkt. no. 127-97].)

From December 2018 through February 2021, Dr. Kim continued to treat Mr. Windley. (Windley SUF ¶¶ 31-33, 36-37, 39-42, 45-48.)

Dr. Kim declared that Mr. Windley made no complaints of pain in July 2019, December 2019, and November 2020. (Kim Decl. ¶¶ 24-25, 28.) Dr. Kim also declared that his physical exams in May 2020, November 2020, and February 2021 were unremarkable. (Id. ¶¶ 27-29.)

With respect to these visits, Mr. Windley's testimony is in tension with Dr. Kim's declaration that no complaints of pain were made. Mr. Windley testified, describing his visits with Dr. Kim generally rather than any specific date, that he asked to be "put[] back on Neurontin and Percocet," that Dr. Kim was "trying to dismiss" him, and that Dr. Kim, after "calling the C.O.," "threw [him] out of his office a lot of times." (Windley Tr. [dkt. no. 113-2] 174:7-13.)

Mr. Windley also testified generally, that "every time" he went to Dr. Kim's office, the only thing Dr. Kim wanted to do at his visits was "put those gloves on" and "check for cancer" in his "backside." (Windley Tr. 172:3-25.)

DOCCS rescinded the MWAP Policy in February 2021. Dr. Kim declared that his last appointment with Mr. Windley was February 2021. (Kim Decl. ¶ 29.)

**Dr. Kim: Granted.**

Dr. Kim was Mr. Windley's primary care provider at Green Haven from 2017 until Mr. Windley's transfer, and saw him regularly throughout that period. (Windley SUF ¶ 4.) In May 2017, Dr. Kim submitted an MWAP request to continue Mr. Windley's existing Neurontin prescription, which RMD Hammer approved for a year. (Windley SUF ¶¶ 5, 14; Kim Decl., Ex. B at 1-2.) When Dr. Kim submitted a renewal request the following year, RMD Hammer denied it, explaining that Lyrica had not been shown effective for radiculopathy, that Neurontin was not FDA-approved for that indication, and that alternative medications lacked Neurontin's abuse and diversion potential. (Kim Decl., Ex. B at 4.) Dr. Kim tapered Mr. Windley off Neurontin and started him on Cymbalta. (Kim Decl. ¶ 19.) When that alone did not control Mr. Windley's pain, Dr. Kim added a second medication, Meloxicam. (Windley SUF ¶¶ 22-23.) Dr. Kim continued to see Mr. Windley on a chronic-care basis for the next two years, monitoring his blood pressure and cholesterol alongside his pain management, until Mr. Windley's transfer out of Green Haven. (Windley SUF ¶¶ 31-33, 36-37, 39-42, 46-47.)

As to the RMD's MWAP denial, Dr. Kim declared that "I had no ability to refill that prescription . . . . The MWAP policy did not have an appeal mechanism and my understanding was there were no other options after a non-approval but to follow the recommendations made by the Regional Medical Director." (Kim Decl. ¶ 12.) This is similar to Plaintiff Hernandez's case, where Dr. Mantaro gave nearly identical testimony stating, "I had no ability to fill these prescriptions without approval. The MWAP policy did not have an appeal mechanism and my understanding was there were no other options after a non-approval but to follow the recommendations made by my clinical supervisor . . . ." Daniels v. Mueller, 2025 WL 949842, at *16 (S.D.N.Y. Mar. 28, 2025). There, as here, Plaintiff argued that the provider should have appealed the denial or prescribed alternative medication. Id. This Court rejected that argument because "there [was] no evidence to the contrary in the record" that any appeal mechanism existed at the relevant time. Id. The same is true here, as the only mechanism Plaintiff identifies, a September 2018 MWAP policy amendment contemplating Chief Medical Officer review, postdates Dr. Kim's June 2018 denial by three months. (Windley SUF ¶ 19 (disputed on the appeal mechanism).) Indeed, the record shows that Dr. Kim was responsive to Mr. Windley's condition notwithstanding the RMD's denial, substituting first Cymbalta,

then adding Meloxicam when Cymbalta alone proved insufficient. (Kim Decl. ¶ 19; Windley SUF ¶¶ 22-23.)

Windley's situation is also like NP Zaccagnino's course of treatment for Plaintiff Locenitt, where the Court found that adjusting a patient's regimen with available alternatives, even where the patient continued to request a specific medication, was a reasonable response as a matter of law. See Allah v. Dinello, 2026 WL 879107, at *25. Plaintiff's contention that Dr. Kim "did nothing to adjust Mr. Windley's medications or to offer him an alternative" is not borne out by the record. (Opp. at 52.) Meloxicam was a second, distinct alternative, added specifically because Cymbalta alone was insufficient. (Windley SUF ¶¶ 22, 26.)

Next Plaintiff takes issue with various visits (December 2019 and November 2020) about which Dr. Kim declared that Mr. Windley made no complaint of pain. (Opp. at 53-54; Silverberg Decl. ¶ 24.) Mr. Windley testified generally that Dr. Kim dismissed him and had him removed from the office "every time," across "twenty to thirty" visits. (Windley Tr. 172:7-10.) Mr. Windley did not, however, identify when or where any particular exchange occurred. That is not enough to create a triable issue. See Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (non-movant must "come forward with specific facts showing that there is a genuine issue for trial," not a "metaphysical possibility that his allegations were correct") (citation omitted)(emphasis omitted); Allah v. Dinello,

2026 WL 879107, at *36 (S.D.N.Y. Mar. 31, 2026) (finding testimony that Plaintiff Van Guilder asked for pain medication "more than five times" insufficient to create a triable issue where plaintiff failed to testify when or where denials occurred).

As to Dr. Kim's physical examination at the May 2020 visit, Plaintiff disputes that any exam occurred, citing the absence of a corresponding chart entry. (Opp. at 53.) Dr. Kim declared under penalty of perjury that he conducted the exam and that the results were unremarkable. (Kim Decl. ¶ 27.) Plaintiff offers no testimony or other evidence that no exam took place, only the absence of a chart entry against that sworn declaration.

Finally, Plaintiff argues that "the only thing that the two parties do agree on" is Dr. Kim's "repeated desire to give Mr. Windley rectal exams, instead of discussing his pain management." (Opp. at 65.) Dr. Kim assessed Mr. Windley for a colonoscopy at their first visit. (Windley SUF ¶ 7.) Plaintiff offers no medical evidence that a rectal exam was medically unnecessary for a man at least 52 years old. Plaintiff's assertion that a rectal exam was the "only thing" Dr. Kim documented is belied by the November 2020 chart entry itself, which also records Mr. Windley's weight and blood pressure, and dates the rectal-exam refusal to December 14, 2018, not that visit. (Agnew Decl. Ex. 35-5 [ECF 127-89] at 164.)

Considering the record as a whole, no reasonable jury could find that Dr. Kim was deliberately indifferent to Mr. Windley's

medical needs. Accordingly, Dr. Kim's motion for summary judgment in 23-cv-7151 is GRANTED.

## IV. Conclusion

In sum, in Pine v. Silver, S.D.N.Y. 23-CV-7148, summary judgment is GRANTED for Dr. Silver and DENIED for Dr. Silverberg. Plaintiff's claim against Dr. Silverberg shall proceed.

In Windley v. Kim, S.D.N.Y. 23-CV-7151, Dr. Kim's motion for summary judgment (dkt. no. 109) is GRANTED. Plaintiff's claims against Defendants Ruiz, Switz, and Baker-Harris, who have not moved, remain.

The Clerk of the Court shall docket this order in Pine v. Silver, S.D.N.Y. 23-CV-7148, and close docket number 92. And the Clerk of Court shall docket this order in Windley v. Kim, S.D.N.Y. 23-CV-7151, and close docket number 109.

Counsel shall confer and inform the Court by letter no later than October 15, 2026, how they propose to proceed.

**SO ORDERED.**

Dated: September 28, 2026
New York, New York

LORETTA A. PRESKA
Senior United States District Judge